IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NIMITZ TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 21-1247-CFC |
| | ) | |
| CNET MEDIA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| NIMITZ TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 21-1362-CFC |
| | ) | |
| BUZZFEED, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| NIMITZ TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 21-1855-CFC |
| | ) | |
| IMAGINE LEARNING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| NIMITZ TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 22-413-CFC |
| | ) | |
| BLOOMBERG L.P., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| MELLACONIC IP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 22-244-CFC |
| | ) | |
| TIMECLOCK PLUS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| MELLACONIC IP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 22-541-CFC |
| | ) | |
| DEPUTY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| LAMPLIGHT LICENSING LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 22-418-CFC |
| | ) | |
| ABB, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| LAMPLIGHT LICENSING LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 22-1017-CFC |
| | ) | |
| INGRAM MICRO, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

November 27, 2023

COLM F. CONNOLLY
CHIEF JUDGE

I have decided to refer the attorneys of record for the plaintiffs in these cases

to the disciplinary counsel of their respective bars. I have also determined it

necessary to refer to the Texas Supreme Court's Unauthorized Practice of Law

Committee certain attorneys associated with the patent monetization firm IP Edge

LLC (IP Edge) and its affiliate Mavexar LLC (Mavexar) for the roles they played

in connection with these cases. I have determined as well that a referral of these

matters to the United States Department of Justice and the United States Patent &

Trademark Office (PTO) for further inquiry is warranted. I explain in this

Memorandum Opinion why I made these decisions.

I.

For reasons detailed in *Nimitz Technologies LLC v. CNET Media, Inc.*, 2022

WL 17338396 (D. Del. Nov. 30, 2022), by early September 2022, I had developed

concerns that the LLC plaintiffs in these patent infringement cases—Nimitz

Technologies LLC (Nimitz), Mellaconic IP LLC (Mellaconic), and Lamplight

Licensing LLC (Lamplight)—may have had undisclosed financial relationships

with IP Edge and may not have complied with my April 18, 2022 standing order

regarding third-party litigation funding. (I adopt and incorporate here *Nimitz*.) To

address those concerns and similar concerns I had about certain LLC plaintiffs in

other patent infringement cases, I issued on September 12 and 13, 2022 in 12

cases, including these cases, orders convening a series of evidentiary hearings to

determine whether the LLC plaintiffs had complied with the third-party litigation

funding standing order. *Id.* at *11. I also directed the owners of the LLC plaintiffs

to attend the hearings in person. *Id.*

On November 4, 2022, I held the first of the scheduled evidentiary

hearings—a consolidated proceeding for these eight cases. As I explained in

*Nimitz*, the evidence adduced at that hearing raised serious concerns that the parties

may have made inaccurate statements in filings with the Court; that counsel for the

plaintiffs may have failed to comply with the Rules of Professional Conduct; that

real parties in interest, such as IP Edge and Mavexar, may have been hidden from

the Court and the defendants; and that those real parties in interest may have

perpetrated a fraud on the court by fraudulently conveying the patents asserted in

this Court to a shell LLC and filing fictious patent assignments with the PTO, all

designed to shield the real parties in interest from the potential liability they would

otherwise face by asserting in litigation the patents in question. *Id.* at *26.

Believing that I needed more information to decide whether further action

was warranted to address these four concerns, I issued in each of these cases on

2

November 10, 2022 a memorandum order requiring the plaintiffs to produce

certain records (the November 10 Memorandum Order). *Nimitz Techs. LLC v.*

*CNET Media, Inc.*, Civ. No. 21-1247, D.I. 27; *Nimitz Techs. LLC v. BuzzFeed,*

*Inc.*, Civ. No. 21-1362, D.I. 21; *Nimitz Techs. LLC v. Imagine Learning, Inc.*, Civ.

No. 21-1855, D.I. 22; *Nimitz Techs. LLC v. Bloomberg L.P.*, Civ. No. 22-0413,

D.I. 18; *Mellaconic IP LLC v. TimeClock Plus, LLC*, Civ. No. 22-0244, D.I. 22;

*Mellaconic IP LLC v. Deputy, Inc.*, Civ. No. 22-0541, D.I. 15; *Lamplight Licensing*

*LLC v. ABB Inc.*, Civ. No. 22-0418, D.I. 24; *Lamplight Licensing LLC v. Ingram*

*Micro, Inc.*, Civ. No. 22-1017, D.I. 17.

The November 10 Memorandum Order required each LLC plaintiff to

produce documents and communications that the LLC plaintiff's owner and the

law firms of its counsel of record had with Mavexar, IP Edge, and certain

individuals associated with Mavexar and IP Edge relating to: the formation of the

LLC plaintiff; the LLC plaintiff's assets; the LLC plaintiff's retention of its

counsel of record; the patents asserted by the LLC plaintiff in these cases; the LLC

plaintiff's potential scope of liability resulting from the acquisition of the patents it

asserted in these actions; the settlement, potential settlement, and dismissal of these

cases; and the November 4 evidentiary hearing.  The November 10 Memorandum

Order also required each LLC plaintiff to produce (1) monthly statements for any

3

bank accounts held by the LLC plaintiff for the period beginning one month before

it filed its complaints in this Court through the November 10 evidentiary hearing;

(2) documents relating to the use, purchase, or lease of the suite address for the

LLC plaintiff identified in the complaints it filed in the actions; and (3) a sworn

declaration of the LLC plaintiff's owner that identified any and all assets owned by

the LLC plaintiff as of the date it filed its complaints in these actions.

On November 16, 2022, Nimitz filed with the United States Court of

Appeals for the Federal Circuit a petition for a writ of mandamus to reverse the

November 10 Memorandum Order. *In re Nimitz Techs. LLC*, No. 23-103, D.I. 2 at

3 (Fed. Cir. Nov. 16, 2022). On November 17, the Federal Circuit stayed the

November 10 Memorandum Order in the Nimitz cases "pending further action of"

that court. No. 23-103, D.I. 5 at 2 (Fed. Cir. Nov. 17, 2022). I granted

Mellaconic's and Lamplight's requests for stays of their cases pending final

disposition of Nimitz's mandamus petition. Civ. No. 22-0244, D.I. 23; Civ. No.

22-0418, D.I. 25.

On December 8, 2022, the Federal Circuit denied Nimitz's petition and lifted

the stay in the Nimitz actions. *In re Nimitz Techs. LLC*, 2022 WL 17494845, at *3

(Fed. Cir. Dec. 8, 2022). In doing so, the Court held that the four concerns I had

identified as the basis for the November 10 Memorandum Order

4

> [a]ll . . . relate[] to potential legal issues in the case,
> subject to the "principle of party presentation," *United
> States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)
> (discussing the principle and its limits), or to aspects of
> proper practice before the court, over which district
> courts have a range of authority preserved by the Federal
> Rules of Civil Procedure, *see* Fed. R. Civ. P. 83(b);
> *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).  The
> district court did not seek information simply in order to
> serve an interest in public awareness, independent of the
> adjudicatory and court-functioning interests reflected in
> the stated concerns.

*Id.* at *2.

Nimitz thereafter filed a combined petition for panel rehearing and rehearing

en banc in the Federal Circuit.  No. 23-103, D.I. 55 (Fed. Cir. Dec. 28, 2022).  On

January 31, 2023, the Federal Circuit denied that petition.  No. 23-103, D.I. 58 at 2

(Fed. Cir. Jan. 31, 2023).  On February 3, Nimitz filed a motion asking the Federal

Circuit "to stay issuing the mandate . . . pending the filing of a petition for

mandamus and/or writ of certiorari in the United States Supreme Court."  No. 23-

103, D.I. 61 at 1 (Fed. Cir. Feb. 3, 2023).  On February 7, the Federal Circuit

issued a written order denying Nimitz's motion to stay the issuance of the mandate.

No. 23-103, D.I. 62 at 2 (Fed. Cir. Feb. 7, 2023).

On February 17, 2023, Mellaconic filed a motion to set aside the

November 10 Memorandum Order.  Civ. No. 22-0244, D.I. 26.  On March 2, 2023,

Lamplight filed a motion to set aside the November 10 Memorandum Order.  No.

22-0418, D.I. 31.  I denied Mellaconic's and Lamplight's motions respectively on May 3, 2023 and May 22, 2023.

Nimitz, Mellaconic, and Lamplight produced documents in response to the November 10 Memorandum Order respectively on April 6, May 9, and May 31, 2023.  It is apparent from the productions themselves that they are not complete.  For example, there are in the productions numerous emails that had attachments at the time the emails were sent but the attachments were not included in the productions.  There are documents in one production that should also have been produced in another production but were not.  But in any event, based on my review of the documents that were produced and the evidence adduced at the hearings I held on November 4, 2022 and November 10, 2022, it appears that (1) counsel of record for the LLC plaintiffs violated numerous rules of professional conduct by actions they took and failed to take; (2) lawyers at IP Edge engaged in the unauthorized practice of law in Texas; and (3) real parties in interest in the patents in these cases, including a foreign government, were not disclosed to the PTO, defendants, or the Court.

## II.

I begin with the four Nimitz cases.  Nimitz is a Texas LLC with no employees.  Its sole owner and member is Mark Hall.  George Pazuniak, a

6

Delaware lawyer, filed four of the above-captioned cases and seven other patent

infringement cases in this Court in Nimitz's name between August 30, 2021 and

March 30, 2022.[1]  Mr. Pazuniak is the only lawyer of record for Nimitz in these

cases.  Nimitz asserted in all 11 cases a single patent: U.S. Patent No. 7,848,328

(the #328 patent).  In each of the complaints filed in the 11 cases, Nimitz claimed

to "hav[e] its office address at 3333 Preston Road STE 300, #1047, Frisco, TX

75034."  That address is in fact a Federal Express drop box.

According to a declaration submitted by Mr. Hall in response to the

November 10 Memorandum Order, the #328 patent was "the only asset owned by

Nimitz" when it filed these suits.  App. A at 2.  Mr. Hall was unable at the

November 4, 2022 hearing to describe anything about the patent or how Nimitz

came into possession of it:

---

[1] *Nimitz Techs. LLC v. CNET Media, Inc.*, Civ. No. 21-1247, D.I. 1 (Aug. 30, 2021); *Nimitz Techs. LLC v. Buzzfeed, Inc.*, Civ. No. 21-1362, D.I. 1 (Sep. 27, 2021); *Nimitz Techs. LLC v. Imagine Learning, Inc.*, Civ. No. 21-1855, D.I. 1 (Dec. 31, 2021); *Nimitz Techs. LLC v. Bloomberg, L.P.*, Civ. No. 21-0413, D.I. 1 (Mar. 30, 2022); *Nimitz Techs. LLC v. Bleacher Rep., Inc.*, Civ. No. 21-1246, D.I. 1 (Aug. 30, 2021); *Nimitz Techs. LLC v. Pinterest, Inc.*, Civ. No. 21-1248, D.I. 1 (Aug. 30, 2021); *Nimitz Techs. LLC v. Reddit, Inc.*, Civ. No. 21-1249, D.I. 1 (Aug. 30, 2021); *Nimitz Techs. LLC v. Conde Nast Ent. LLC*, Civ. No. 21-1360, D.I. 1 (Sep. 27, 2021); *Nimitz Techs. LLC v. Skillshare, Inc.*, Civ. No. 21-1363, D.I. 1 (Sep. 27, 2021); *Nimitz Techs. LLC v. Twitter, Inc.*, Civ. No. 21-1364, D.I. 1 (Sep. 27, 2021); and *Nimitz Techs. LLC v. Tastemade, Inc.*, Civ. No. 21-1856, D.I. 1 (Dec. 31, 2021).

Q.  Do you know what the name of th[e] [#328] patent is?

A.  I do not.

* * * *

Q.  What technology is covered by the [#]328 patent?

A.  I haven't reviewed it enough to know.

* * * *

Q.  How did you pay for the [#328] patent?

A.  There was an agreement between Mavexar and myself where I would assume liability.

Q.  What does that mean?

A.  No money exchanged hands from my end.

Q.  You have to—I'm not a financial guy, so you have to explain it to me.
        So you own the patent, but no money—you didn't exchange any money for it?

A.  No.

Q.  So is that what you're saying?

A.  Yes.

Q.  *So how do you come to own something if you never paid for it with money?*

A.  *I wouldn't be able to explain it very well.  That would be a better question for Mavexar.*

8

> Q.  Well, you're the owner?
>
> A.  Correct.
>
> Q.  *How do you know you're the owner if you didn't pay anything for the patent?*
>
> A.  *Because I have the paperwork that says I'm the owner.*

Civ. No. 21-1247, D.I. 26 at 66:5–6; 67:23–24; 69:16–70:11 (emphasis added).

The #328 patent is titled "Broadcast Content Encapsulation."  According to Mr. Pazuniak, the "goal" of the #328 patent is to provide "a method to stream multiple versions of a specific content [such as movies and live events] so as to efficiently make the content available to users operating on diverse platforms and in diverse environments."  Civ. No. 21-1247, D.I. 14 at 8.

The application for the #328 patent and any and all patents issued from that application were assigned to Nokia Corporation in 2008.  That assignment was recorded with the PTO in 2008; and thus, when the PTO issued the #328 patent in 2010, it identified Nokia as the assignee on the face of the patent.  Civ. No. 21-1247, D.I. 1-1.

In February 2013, Nokia assigned the #328 patent, seven other U.S. patents, and certain patent applications and foreign patents to France Brevets, a so-called

"sovereign state fund" owned by the French government.[2]  France Brevets

recorded the Nokia/France Brevets assignment of the #328 patent application with

the PTO in July 2013.

On August 12, 2021, Burley Licensing LLC (Burley) electronically filed

with the PTO an assignment of the #328 and ten other U.S. patents.  *See* App. C.

The Patent Assignment Cover Sheet for that filing identifies Hau Bui as the

submitter, but the email address provided for the submitter is Linh Deitz's IP Edge

email address.  *Id.* at 1.  Ms. Deitz's title with IP Edge is Office Manager.  Mr. Bui

testified at the November 4, 2020 hearing that Mavexar formed Burley and that

"Linh D[ei]tz was [his] primary communication with Mavexar."  Civ. No. 21-

1247, D.I. 26 at 93:21; 100:19–23.  Putting aside the question of who actually filed

the assignment with the PTO, that person attached as "Exhibit A" to the Patent

Assignment Cover Sheet a PDF of a five-page document titled "Patent

---

[2] According to the French Ministry of Higher Education and Research, France
Brevets is a French investment fund specializing in intellectual property that was
formed in 2009 with €100 million in seed money from the French government.
*See France Brevets: Un intermédiaire actif entre les titulaires de brevets et les
utilisateurs potentiels* [*France Brevets: an active intermediary between patent
holders and potential users*], MINISTRE DE L'ENSEIGNEMENT SUPÉRIEUR ET DE LA
RECHERCHE [MINISTRY OF HIGHER EDUCATION AND RESEARCH OF THE FRENCH
REPUBLIC] (Nov. 18, 2015), https://www.enseignementsup-
recherche.gouv.fr/fr/france-brevets-un-intermediaire-actif-entre-les-titulaires-de-
brevets-et-les-utilisateurs-potentiels-46321 [https://perma.cc/C5CA-BPS4].

Assignment."  The Patent Assignment is dated March 11, 2021, and according to its terms, France Brevets assigned to Burley on that day "for good and valuable consideration . . . *all* right, title, *and interest that exist today and may exist in the future in and to*" the #328 patent and the other ten U.S. patents listed in the Patent Assignment Cover Sheet as well as several patent applications and foreign patents. App. C at 3 (emphasis added).  The Patent Assignment, which has electronic signatures for Hau Bui on behalf of Burley and Didier Patry on behalf of France Brevets, goes on to state that the "right, title, and interest" in the covered patents and patent applications France Brevets assigned to Burley "includ[es] *all income, royalties, damages and payments now or hereafter due or payable with respect thereto*" and "the right to bring any claim, sue, counterclaim, *and recover for the past, present and future infringement* of" those patents and patent applications. App. C at 7 (emphasis added).

The identical France Brevets/Burley Patent Assignment filed by Burley with the PTO is included in Nimitz's production, but in the Nimitz production it is attached as "Exhibit A" to a 15-page "Patent Assignment Agreement" between France Brevets and Burley.  *See* App. D.  Like the France Brevets/Burley Patent Assignment, the France Brevets/Burley Patent Assignment Agreement is dated March 11, 2021; and it too has electronic signatures for Hau Bui and Didier Patry.

11

App. D at 15.  Under the terms of the France Brevets/Burley Patent Assignment

Agreement, France Brevets and Burley "agree[d] to execute" and to "fully

incorporate" into the agreement as "Exhibit A" the France Brevets/Burley Patent

Assignment that was filed with PTO.  App. D at 2.  But paragraph 4 of the France

Brevets/Burley Patent Assignment Agreement, titled "Consideration," expressly

states that Burley "shall pay [France Brevets] thirty-five percent (35%) of all Gross

Revenue actually received by [Burley] as a result of monetizing and enforcement

of" the patents and patent applications covered by the Patent Assignment.  App. D

at 3.  The Patent Assignment Agreement defines "Gross Revenue" as "any fees,

payments, revenues, royalties, settlements paid by any licensees or assignees,

damages awarded by any court and/or administrative body and/or any other

consideration actually received, by [Burley] or [Burley's] Affiliates arising from or

in any way related to" the patents and applications listed in the France

Brevets/Burley Patent Assignment.  App. D at 2.  Thus, arguably under the express

terms of the Patent Assignment Agreement, Burley was not assigned or entitled to

"all income, royalties, damages and payments now or hereafter due or payable with

respect" to the #328 patent or the patents and patent applications listed in the

France Brevets/Burley Patent Assignment filed with the PTO.  App. D at 2.

12

Paragraph 5 of the France Brevets/Burley Patent Assignment Agreement, titled "Assignment," provides in relevant part:

> [Burley] undertakes to transfer back the ownership of the [patents and patent applications listed in the Patent Assignment] to [France Brevets] in the event of non-compliance by [Burley] with, at least, one (1) of the objectives listed hereafter:
>
> – bring an action for infringement against a third party within twelve (12) months from the Effective Date [March 11, 2021]; and
>
> – generate a total minimum Gross Revenue of US $100,000.00 within twenty four (24) months from the Effective Date (collectively the "Compliance Period")
>
> During Compliance Period, [Burley] shall not assign or transfer, without [France Brevet's] consent, the [patents and patent applications listed in the Patent Assignment].

App. D at 5. Paragraph 5's "transfer-back" "undertak[ing]" provision and its prohibition on assigning and transferring the #328 patent during the Compliance Period (i.e., until March 21, 2023) without the consent of France Brevets are arguably at odds with the statement in the Patent Assignment filed with the PTO that France Brevets assigned to Burley "*all* right, title, *and interest that exist today*

13

*and may exist in the future in and to*" the patents and patent applications listed in the Patent Assignment.[3]

On August 16, 2021—four days after Linh Deitz's IP Edge email account was used to file the France Brevets/Burley Patent Assignment—Duy Tran, a Texas lawyer and, at that time, a director of IP Edge,[4] sent an email to Mr. Pazuniak with

---

[3] Section 3.56 of the Code of Federal Regulations for Patents, Trademarks, and Copyrights provides:

> Assignments which are made conditional on the performance of certain acts or events, such as the payment of money or other condition subsequent, if recorded in the [PTO], are regarded as absolute assignments for [PTO] purposes until canceled with the written consent of all parties or by the decree of a court of competent jurisdiction. The [PTO] does not determine whether such conditions have been fulfilled.

37 C.F.R. § 3.56. "The recording of a document is not a determination by the [PTO] of the validity of the document or the effect that document has on the title to an application or patent." MPEP § 317.03. *See also* 37 C.F.R. § 3.54. As the regulation itself and the guidance of the Manual of Patent Examining Procedure make clear, § 3.56 "serves as notification as to how a conditional assignment will be treated by the [PTO]." *Id.* The regulation in no way authorizes persons to represent to the PTO that an assignment has no conditions when in fact the assignment has conditions.

[4] According to Mr. Tran's LinkedIn page, during his tenure as a director at IP Edge, he "[a]ssisted in the development and implementation of a platform allowing for efficient and accurate management of a docket of over 400 open matters at any given time," "[a]ssisted in the negotiation of over 2000 licensing agreements creating more than $30M of revenue for clients," and coordinated "a team of over 20 outside attorneys." Duy Tran, LINKEDIN, https://www.linkedin.com/in/duy-tran-204aa34b [https://perma.cc/J67T-5KFZ] (last visited November 14, 2023).

14

the subject line "Claim Charts for France Brevet HLS Uploaded."  In the text of

the email, Mr. Tran explained that he had "uploaded claim charts for 4 targets to

[Mr. Pazuniak's] Dropbox" and asked Mr. Pazuniak to "please review" the charts.

App. E at 1.  Mr. Tran copied Ms. Deitz and Brandon LaPray, also employed by IP

Edge at the time, on the email.  The claim charts Mr. Tran provided to Mr.

Pazuniak map claim 1 of the #328 patent against the websites of Buzzfeed;

Twitter; GameSpot.com, a wholly-owned subsidiary of CNET; and

BonAppetit.com, a wholly-owned subsidiary of Conde Nast Entertainment.  (Mr.

Pazuniak eventually filed suits in Nimitz's name for infringement of the #328

patent against Buzzfeed (Civ. No. 21-1362), Twitter (Civ. No. 21-1364), CNET

(Civ. No. 21-1247), and Conde Nast Entertainment (Civ. No. 21-1360).)

The next day, August 17, 2021, in a "reply to all" email, Mr. Pazuniak

responded to Mr. Tran's email as follows:

> The current Assignee for the '328 Patent is listed on the
> PTO website as:
>
> FRANCE BREVETS
> 47 RUE DE LA VICTOIRE
> PARIS 75009
> FRANCE
>
> Is this still the current owner and the proposed Plaintiff in
> the actions?

App. E at 2.  Mr. LaPray responded about two hours later:

> Hi George – It is not. *We* bought the patents from France Brevets. Below is the Plaintiff info. *We* will get the assignment recorded.
>
> Nimitz Technologies LLC
> 3333 Preston Road STE 300, #1047, Frisco, TX 75034
> Managing Member – Mark Hall

App. E at 2 (emphasis added).

Nimitz (i.e., Nimitz Technologies LLC) did not exist at the time Mr. LaPray sent this email. But within hours of the email, Linh Deitz obtained a mailing address for Nimitz from Staples, and a certificate of formation for Nimitz was filed with the Texas Secretary of State. *See* Apps. F and G. The certificate identified Mark Hall as Nimitz's managing member. The Secretary of State approved the certificate and Nimitz came into existence on August 18, 2021. *See* App. G at 1.

Nimitz did not produce any responses by Mr. Pazuniak to Mr. LaPray's August 17, 2021 email. The fact that Mr. Hall is Nimitz's managing member does not preclude there from being other members of the LLC, and it could be reasonably inferred from Mr. LaPray's use of "we" in his email to Mr. Pazuniak that IP Edge (or an affiliate like Mavexar) had an ownership interest in Nimitz. Mr. Pazuniak, however, represented at the November 4, 2022 hearing that he understood from the outset of his representation of Nimitz that Nimitz was solely owned by Mr. Hall.

16

That said, Mr. Pazuniak's explanation at the hearing about how he came to represent Nimitz stands in contrast to the emails he exchanged with Messrs. Tran and LaPray on August 16 and 17, 2021:

> MR. PAZUNIAK:  And maybe I would just say some things upfront and save us a lot of trouble.
>
> THE COURT:  That would be great.
>
> MR. PAZUNIAK:  Similar to Mr. Chong, yes, *I was contacted by what I understood to be an agent for Nimitz Technologies.*
>
> THE COURT:  A nonlawyer agent, right?
>
> MR. PAZUNIAK:  It's not a lawyer. It's a lady by the name of Linh D[ei]tz, L-I-N-H D-I-T-Z.
>
> THE COURT:  Wait. I'm sorry. L-I?
>
> MR. PAZUNIAK:  L-I-N-H.
>
> THE COURT:  Okay.
>
> MR. PAZUNIAK:  And the second name, D-I-T-Z. Hopefully, I got it right.
>
> *But the—she was representing Nimitz Technologies.*  And she had provided the basic information.  Thereafter, I did my own investigation, in the sense of double-checking the patent, double-checking the Nimitz Technology.  For example, I did go to the Texas Secretary of State's Website to gain the information about Nimitz Technology, and that's what I put down into the complaint.

17

Similar, I went to the Delaware Secretary of State's office to obtain information on the defendants, and making sure that the correct entities were named, correct spellings and correct addresses.

The complaint was entirely drafted by me.

Prior to that, we, of course, had the retainer agreement. That retainer agreement, again, I drafted. And it was forwarded to Linh D[ei]tz, to forward to Mark Hall as the principle of Nimitz Technologies.

I knew that he was the principle because of the—I had double-checked the Secretary of State's office before I prepared the retainer letter.

THE COURT: Okay.

MR. PAZUNIAK: And—

THE COURT: So you knew he was the principle based on the Secretary of State's disclosure—

MR. PAZUNIAK: And—

THE COURT: —he was the principle of Nimitz?

MR. PAZUNIAK: He is—Mr. Hall is the—I think that— I want to make sure I have the phrase right. He's the managing member of the entity. *And it was confirmed by Ms. D[ei]tz that he was the sole, 100 percent, owner of the entity.*

Civ. No. 21-1247, D.I. 26 at 41:21–43:15 (emphasis added). As the email

exchanges make clear, Mr. Pazuniak could not have "understood" when he was

first contacted by Ms. Deitz (or anyone else from IP Edge or Mavexar) that Ms.

Deitz (or anyone else) was an agent for or "was representing" Nimitz because Mr.

18

Pazuniak did not learn of Nimitz's existence until after he had already begun his review (at IP Edge's request) of the claim charts for four potential litigation "targets" and after Mr. Pazuniak himself had asked IP Edge who "the proposed Plaintiff" would be in the #328 patent infringement actions contemplated by IP Edge.

On August 26, 2021, Mr. LaPray followed up on his August 17, 2021 email with this "reply to all" message in the email chain:

> Hi George.
>
> Attached is the assignment.  I believe Linh is recording this today but I will let her confirm.
>
> How are the complaints coming along?  Are you still good to file this month?
>
> Thanks,
>
> Brandon

App. H at 1.  Mr. LaPray attached to his email a two-page document titled "Ex. A-Burley-France – Nimitz Technologies (Fully Executed).pdf."  That same day, someone using Linh Deitz's IP Edge email account electronically filed a PDF of that Patent Assignment with the PTO in Nimitz's name.  App. H; App. I.  The Patent Assignment Cover Sheet for that filing identifies Mark Hall, Nimitz's managing member, as the submitter.  App. I at 1.

19

The Patent Assignment is dated August 20, 2021. It is electronically signed by Mr. Hall for Nimitz and by Hau Bui for Burley. (At the November 4, 2022 hearing Mr. Hall testified that he did not know Mr. Bui. Mr. Bui testified that the name Mark Hall "did not ring a bell." Civ. No. 21-1247, D.I. 26 at 72:8–11; 99:10–15.) Although Mr. Hall's electronic signature is dated August 20, 2021 on the assignment, documents produced by Nimitz in response to the November 10 Memorandum Order show that he did not sign it until August 24, 2021—after Linh Deitz emailed him the Patent Assignment and asked him to sign it and return it to her.

According to the terms of the Patent Assignment, Burley assigned to Nimitz on August 20, 2021 "for good and valuable consideration . . . *all* right, title, *and interest that exist today and may exist in the future in and to*" the #328 patent. App. I at 2 (emphasis added). The Patent Assignment also expressly states that the "right, title, and interest" in the #328 patent "includ[es] *all income, royalties, damages and payments now or hereafter due or payable with respect thereto*" and "the right to bring any claim, sue, counterclaim, *and recover for the past, present and future infringement* of" the #328 patent. App. I at 2 (emphasis added).

These statements stand in contrast to a Patent Assignment Agreement submitted as an exhibit at the November 4, 2022 hearing and in the production

20

Nimitz made in response to the November 10 Memorandum Order. App. J. That

Patent Assignment Agreement is between Burley and Nimitz and, like the

Burley/Nimitz Patent Assignment filed with the PTO, it is dated August 20, 2021

and appears to be electronically signed by Hau Bui and Mark Hall. App. J at 4–5.

As in the case of the France Brevets/Burley Patent Assignment Agreement, the

parties to the Burley/Nimitz Patent Assignment Agreement "agree[d] to execute"

and to "fully incorporate" into that agreement another form of assignment (in this

case, the Burley/Nimitz Patent Assignment that was filed with PTO on August 26,

2021). App. J at 1. In paragraph 4 of the Burley/Nimitz Patent Assignment

Agreement—titled "Consideration"—Nimitz assumed all the obligations Burley

had assumed in the France Brevets/Burley Patent Assignment Agreement with

respect to the #328 patent:

> [Nimitz] hereby assumes all of the obligations of the
> Patent Assignment Agreement made and entered into on
> March 11, 2021, by and between France Brevets and
> Burley Licensing LLC ("Prior Agreement"), including
> Paragraph 4 of the Prior Agreement. [Nimitz] also
> understands and acknowledges that [Burley] or prior
> owners may have granted licenses, covenants not to sue,
> releases, and other encumbrances with respect to the
> Patents and Related Patents ("Patent Encumbrances").
> [Nimitz] expressly agrees to be bound by and take the
> [#328 patent] subject to all such Patent Encumbrances.

21

App. J at 2.  Thus, under the terms of the Burley/Nimitz Patent Assignment
Agreement—and in contrast with the terms of Patent Assignment filed under
Nimitz's name with the PTO on August 26, 2021—France Brevets appears to have
a reversionary ownership interest in the #328 patent and the right to 35% of the
income generated from the monetization and enforcement of the #328 patent and to
preclude Nimitz from assigning or transferring the #328 patent through March 21,
2023.

The terms of the Burley/Nimitz Patent Assignment filed with the PTO on
August 26, 2021 also stand in contrast to the form "Consulting Services"
agreement between Nimitz and Mavexar dated August 21, 2021 that was included
in the Nimitz document production.  App. K.  The agreement appears to be
electronically signed by Sanjay Pant on behalf of Mavexar and Mr. Hall on behalf
of Nimitz.  App. K at 6.  Mr. Pant is a lawyer and one of IP Edge's two Managing
Partners.  *See Team*, IP EDGE, https://www.ip-edge.com/team/
[https://perma.cc/2D8J-J2YW] (last visited November 20, 2023).  Under the terms
of the agreement, Mavexar promised to "provide non-legal services," including
among other things "assisting [Nimitz] in monetizing" any patents owned by
Nimitz.  App. K at 1.  In exchange for those services, Nimitz agreed to pay
Mavexar a percentage of the "Net Proceeds," which the agreement defines as

22

"Gross Recovery minus Costs and Expenses." App. K at 2. The agreement defines "Gross Recovery" as "the gross amount of any monies and other forms of consideration received through monetization of" Nimitz's patents and further provides that "Gross Recovery shall include, without limitation, any and all settlement fees, licensing fees, fees from a sale, or other payment from other transactions, as well as, any other proceeds (including assets) related to" any patents owned by Nimitz. App. K at 2.

Neither the Consulting Services agreement nor any document produced by Nimitz identifies the percentage of the Net Proceeds Nimitz agreed to pay Mavexar. The Consulting Services agreement says only that the percentage is "[a]s agreed by Client and Consulting Company." App. K at 2. Mr. Hall testified at the November 4, 2022 hearing, however, that he "believe[d]" that Nimitz received ten percent of the recoveries obtained from asserting Nimitz's patents. Civ. No. 21-1247, D.I. 26 at 74:9–11. Thus, although the Burley/Nimitz Patent Assignment filed with the PTO states that Nimitz's "right, title, and interest" in the #328 patent "includ[es] all income, royalties, damages and payments now or hereafter due or payable with respect thereto," it appears that at the time the Burley/Nimitz Patent Assignment was filed with the PTO Mavexar was

23

contractually entitled to 90% of the profits generated from licensing and litigating the #328 patent.

About an hour after Mr. LaPray sent his August 26, 2021 email to Mr. Pazuniak and told him that Linh Deitz would be recording the Burley/Nimitz Patent Assignment with the PTO, Ms. Deitz emailed Mr. Hall an engagement letter from Mr. Pazuniak's law firm for Mr. Hall to sign.  App. L.  An email sent to Ms. Deitz's email address 30 minutes later from DocuSign System confirmed that Mr. Hall electronically signed the engagement letter.  App. M.  These two emails are the only communications produced by Nimitz that concern the engagement letter, even though the November 10 Memorandum Order required Nimitz, Mr. Pazuniak, and Mr. Pazuniak's firm to produce "[a]ny and all communications and correspondence, including emails and text messages, that [Mr. Hall, Mr. Pazuniak, or any employee of Mr. Pazuniak's law firm] had with Mavexar, IP Edge, Linh D[ei]tz, Papool Chaudhari, and/or any representative of Mavexar and/or IP Edge regarding: . . . the retention of [Mr. Pazuniak's firm] to represent Nimitz in these cases."  No. 21-1247, D.I. 27 at 3–4.  The production includes a copy of the engagement letter signed by Mr. Hall, but it cannot be determined if, when, how, or from whom Mr. Pazuniak obtained that executed version.  App. N.  Nor can it

24

be determined from the production when, how, or from whom, Ms. Deitz obtained

the unsigned engagement letter she sent to Mr. Hall on August 26, 2021.

The engagement letter purports to "set forth the terms and conditions on

which [Mr. Pazuniak's firm] ('Counsel') shall undertake to represent [Nimitz]

('Client') in litigations in the District of Delaware."  App. N at 1.  Under the

heading "Conflicts, Instructions," the letter identifies "Bon Appeti[t], Pinterest,

Skillshare; and Warner Media[], and any affiliate of the foregoing" as the "Adverse

Parties" for the engagement.  App. N at 1.  The letter states that Mr. Pazuniak's

firm "will receive a contingency fee" of between 25 and 40 percent of "the Net

Amount recovered from any Adverse Party," depending on the timing of the

recovery.  App. N at 2.  And under the heading "Client Acknowledgement," the

letter provides:

> Client acknowledges that Client has been encouraged by
> Counsel to consult independent counsel concerning the
> negotiation of this fee agreement and its terms.  Client
> has consulted with independent counsel, and has made
> sufficient investigation and inquiry to determine that this
> agreement is fair and reasonable to Client; and that this
> agreement was the product of arm's length negotiation
> with Counsel.  Client acknowledges that Client has either
> consulted such independent counsel or, having had an
> adequate opportunity to seek such advice, has declined to
> follow Counsel's advice to do so.

App. N at 4.  In point of fact, as of August 26, 2021, neither Mr. Pazuniak nor any

lawyer from his firm had ever met, spoken, emailed, or otherwise communicated

with Mr. Hall.

As noted above, Mr. Pazuniak ultimately filed on behalf of Nimitz 11 cases

in this Court, one case in the Northern District of Texas, and nine cases in the

Western District of Texas.[5]  Mr. Hall testified, and Mr. Pazuniak did not dispute,

that Mr. Pazuniak had no communications with Mr. Hall before he filed the

complaints in these actions and that Mr. Hall had no prior knowledge of the

complaints before they were filed.  Civ. No. 21-1247, D.I. 26 at 76:13–77:3.

---

[5] *Nimitz Techs. LLC v. Reuters News & Media Inc.*, Civ. No. 3:22-1929 (N.D.
Tex., filed Aug. 31, 2022); *Nimitz Techs. LLC v.  ESPN Productions, Inc.*, Civ. No.
6:21-1384 (W.D. Tex., filed Dec. 30, 2021); *Nimitz Techs. LLC v. Nexstar Media,
Inc.*, Civ. No. 6:21-1385 (W.D. Tex., filed Dec. 30, 2021); *Nimitz Techs. LLC v.
ViaSat, Inc.*, Civ. No. 6:21-1386 (W.D. Tex., filed Dec. 30, 2021); *Nimitz Techs.
LLC v. Oncor Electric Delivery Co. LLC*, Civ. No. 6:22-429 (W.D. Tex., filed Apr.
28, 2022); *Nimitz Techs. LLC* v. CDM Smith, Inc., Civ. No. 6:22-547 (W.D. Tex.,
filed May 29, 2022); *Nimitz Techs. LLC v. NPG of Texas, L.P.* Civ. No. 6:22-707
(W.D. Tex., filed June 30, 2022); *Nimitz Techs. LLC v. Shop LC Global Inc. d/b/a
Shop LC,* Civ. No. 6:22-708 (W.D. Tex., filed June 30, 2022); *Nimitz Techs. LLC
v. C.H. Robinson Worldwide, Inc.*, Civ. No. 6:22-1236 (W.D. Tex., filed Nov. 30,
2022); *Nimitz Techs. LLC v. Clayton Homes, Inc.*, Civ. No. 6:22-1239 (W.D. Tex.,
filed Nov. 30, 2022).

Mr. Pazuniak filed motions to voluntarily dismiss 13 of the cases between December 14, 2021 and October 6, 2022.[6]  Mr. Hall testified, and Mr. Pazuniak did not dispute, that Mr. Hall was never informed of, let alone asked by Mr. Pazuniak if he consented to, the terms of the settlements in those cases before Mr. Pazuniak moved to dismiss the cases.  Civ. No. 21-1247, D.I. 26 at 76:23–77:3.

It appears from Nimitz's document production that the first time Mr. Pazuniak and Mr. Hall were parties to the same email occurred on October 3, 2022—more than a month after I issued the Memorandum Order scheduling the November 4, 2022 hearing.  The October 3 email was sent by Linh Deitz to Mr. Hall.  It was occasioned by IP Edge's decision to convene weekly hearing

---

[6] Civ. No. 21-1247, D.I. 42 (Oct. 26, 2023); Civ. No. 21-1362, D.I. 36 (Oct.26, 2023); Civ. No. 21-1855, D.I. 37 (Apr. 20, 2023); Civ. No. 21-0413, D.I. 33 (Oct. 26, 2023); *Nimitz Techs. LLC v. Bleacher Rep., Inc.*, Civ. No. 21-1246, D.I. 10 (Dec. 14, 2021); *Nimitz Techs. LLC v. Pinterest, Inc.*, Civ. No. 21-1248, D.I. 10 (Dec. 20, 2021); *Nimitz Techs. LLC v. Reddit, Inc.*, Civ. No. 21-1249, D.I. 11 (Dec. 22, 2021); *Nimitz Techs. LLC v. Conde Nast Ent. LLC*, Civ. No. 21-1360, D.I. 10 (Feb. 4, 2022); *Nimitz Techs. LLC v. Skillshare, Inc.*, Civ. No. 21-1363, D.I. 15 (Apr. 27, 2022); *Nimitz Techs. LLC v. Twitter, Inc.*, Civ. No. 21-1364, D.I. 8 (Dec. 14, 2021); *Nimitz Techs. LLC v. Tastemade, Inc.*, Civ. No. 21-1856, D.I. 8 (Apr. 27, 2022); *Nimitz Techs. LLC v. ESPN Productions, Inc.*, Civ. No. 6:21-1384, D.I. 11 (June 29, 2022); *Nimitz Techs. LLC v. Nexstar Media, Inc.*, Civ. No. 6:21-1385, D.I. 10 (June 2, 2022); *Nimitz Techs. LLC v. ViaSat, Inc.*, Civ. No. 6:21-1386, D.I. 11 (May 24, 2022); *Nimitz Techs. LLC v. CDM Smith Inc.*, Civ. No. 6:22-0547, D.I. 7 (Aug. 1, 2022); *Nimitz Techs. LLC v. NPG of Texas, L.P.*, Civ. No. 6:22-0707, D.I. 8 (Oct. 6, 2022); *Nimitz Techs. LLC v. Oncor Electric Delivery Co. LLC*, Civ. No. 6:22-0429, D.I. 11 (Oct. 13, 2022).

preparation calls for each of the plaintiff LLC owners I had ordered to appear in court.  *See* App. O.  Ms. Deitz cc'd Mr. Pazuniak and two of her colleagues at IP Edge: Gautham [a/k/a Gau] Bodepudi and Papool Chaudhari.  The email reads in relevant part:

> Hello Mark,
>
> Your calls to discuss the Connolly hearings will be on Tuesday [October 11] at 12pm CST with our team (Gau and Papool) and lead counsel – George Pazuniak.  Please see the link for the materials you can review prior to the video calls.  I have sent a calendar invite with a link to join the calls.
>
> \* \* \* \*
>
> Sincerely,
>
> Linh D[ei]tz
> Office Manager
> IP Edge LLC

App. O.

Mr. Bodepudi is IP Edge's other Managing Partner and, like Mr. Pant, he too is a lawyer.  *See Team*, IP EDGE, https://www.ip-edge.com/team/ [https://perma.cc/2D8J-J2YW] (last visited November 20, 2023).  Mr. Chaudhari's role at IP Edge and Mavexar is not entirely clear.  He uses an IP Edge email account and he puts "IP Edge" below his name in his email signature, but he does not include a job title in the signature.  When I asked Mr. Chong at the November

28

4, 2022 hearing, "who[m] do you speak with at Mavexar?" he said, "[T]ypically, it's going to be Papool Chaudhari."  Mr. Chong explained: "I work with [Mr. Chaudhari] through Mavexar.  He may have a law firm.  He may—but I deal with him through Mavexar."  Civ No. 22-0418, D.I. 23 at 7:16–18; 8:12–21.  According to Mr. Chaudhari's LinkedIn page, he is a Texas lawyer who serves as the general counsel of an unnamed "technology licensing company."  Papool Chaudhari, LINKEDIN, https://www.linkedin.com/in/papool-chaudhari-846b417 [https://perma.cc/M5KN-B4HA] (last visited November 16, 2023).  Whatever formal position Mr. Chaudhari may hold or have held with IP Edge and/or Mavexar, the document productions make clear that he, more than any other individual, directed LLC plaintiffs' counsel of record in these cases about how to respond to my orders and he oversaw the prepping of Messrs. Bui and Hall for their testimony at the November 4, 2022 hearing.  The documents also make clear, that Mr. Chaudhari very much wanted Mavexar to be hidden from the Court.  For example, within hours of my issuing on September 12, 2022 the first orders convening the November 2022 evidentiary hearings, Mr. Chaudhari wrote this email to Howard Wernow, one of Mellaconic's lawyers:

> Howard
>
> See attached ([Mavexar consulting agreement] for Mellaconic).  Again we reiterate that we do <u>not</u> want to

29

disclose Mavexar by name, but rather just disclose that recourse funding exists.

Also, my understanding is that hearing notices on third party funding went out for Creekview, Lamplight, and Backertop, and we have those Mavexar agreements too. I can send those to respective counsel on those cases as well. They are the same as this agreement.

Thanks,

Papool

Papool Chaudhari
IP Edge
papool@ip-edge.com

App. P at 1 (underline in the original).[7]

---

[7] Mr. Chaudhari cc'd on his email Messrs. Pant and Bodepudi, an administrative assistant at IP Edge named Danae Maher, and three lawyers who represented plaintiff LLCs that were subject to the orders I issued on September 12 and 13, 2022. The email is marked "Common interest Attorney-Client Privilege," but the email does not disclose a communication to or from a client and therefore it is not an attorney-client communication, let alone a privileged attorney-client communication. Counsel have consistently maintained in these actions that IP Edge and Mavexar are *not* their clients.

In addition, because, as discussed below, *see infra* Section V, there is prima facie evidence to suggest that IP Edge and Mavexar actors engaged in the unauthorized practice of law (a crime in Texas), any communications IP Edge and Mavexar actors had in connection with these matters fall within the crime/fraud exception to the attorney-client privilege and attorney work product doctrines. *In re Grand Jury Investigation*, 445 F.3d 266, 274 (3d Cir. 2006); *see also Clark v. United States*, 289 U.S. 1, 15 ("To drive the [attorney-client] privilege away, there must be 'something to give colour to the charge'; there must be 'prima facie evidence that it has some foundation in fact.'") (citations omitted).

When Mr. Hall did not get on the October 11, 2022 call, Mr. Chaudhari

emailed him, cc'ing Messrs. Pazuniak and Bodepudi and Ms. Deitz: "Mark, Are

you able to join the weekly call now?  We are on."  App. Q at 2.  The production

does not contain a response to this email from Mr. Hall.  Shortly after the call

concluded, Ms. Deitz emailed Mr. Pazuniak:

> Hello George:
>
> I'm sorry Mark was not able to attend the call today, he
> had to go into the office and was not able to participate in
> the call.  He is however available this Friday at noon CST.
> Can you talk then for the call?
>
> Sincerely,
>
> Linh Deitz
> Office Manager
> IP Edge LLC

App. Q at 1.  The production does not contain any response to this email, and it

cannot be determined from any document in the production whether a call was held

that Friday.

The following Tuesday, October 18, 2022, in an email sent to Mr. Hall at

12:06 p.m. central time, cc'ing Messrs. Pazuniak and Bodepudi and Ms. Deitz, Mr.

Chaudhari asked: "Mark, [a]re you able to join the weekly video call now?  We are

on.  Here is the link if you need it."  App. R.  The production does not contain any

responses to this email.  Nor does it contain any documents that indicate whether Mr. Hall joined the October 18 video call.

The production contains another email dated October 18, 2022 that was sent by Mr. Pazuniak to Mr. Hall.  It appears from the production that this email is the first direct communication Mr. Pazuniak had with Mr. Hall.  The email reads:

> Mark,
>
> This email is only to you.
>
> Please understand that, as a legal and professional matter, my only client is Nimitz Technologies, and, thus, you.  I do not represent Mavexar or any other entity, and I would be in breach of professional responsibilities if I placed any interest ahead of yours.  Your communications with me are completely privileged, which means that I cannot legally or ethically disclose our communications to anyone.
>
> If you have any questions between now and when we chat on Nov. 3, please feel free to email me or call me.
>
> George

App. S.[8]

---

[8] Although the email is marked "attorney client privileged," it is not a privileged communication, as it does not contain legal advice and merely communicates one of the general terms of Mr. Pazuniak's representation of Nimitz. *Idenix Pharms., Inc. v. Gilead Scis., Inc.*, 195 F. Supp. 3d 639, 643 (D. Del. 2016); *see also Avgoustis v. Shinseki*, 639 F.3d 1340, 1344 (Fed. Cir. 2011) ("Courts have consistently held that the general subject matters of clients' representations are not privileged.") (internal citations omitted).

III.

I turn next to the two Mellaconic cases.  Like Nimitz, Mellaconic has no

employees.  And like Nimitz, Mellaconic has one owner who is also its only

member.  That person, Hau Bui, makes his daily living as the proprietor of a food

truck and restaurant.  Civ. No. 1:22-cv-0244, D.I. 20 at 86:1–2.  He is also the

owner of Burley.  Mr. Bui testified at the November 4, 2022 hearing that Mavexar

formed Mellaconic and Burley.  Civ. No. 1:22-cv-0244, D.I. 20 at 90:9–11.

Documents produced by Mellaconic in response to the November 10

Memorandum Order confirm that Linh Deitz filed a certificate of formation for

Mellaconic with the Texas Secretary of State on August 4, 2020 that was approved

on August 5, 2020.  App. T.

Mellaconic filed two of the above-captioned cases and 17 related cases in

this Court between September 30, 2020 and April 27, 2022.[9]  Jimmy Chong, a

---

[9] *Mellaconic IP LLC v. RideCell, Inc.*, Civ. No. 20-1323, , D.I. 1 (filed Sep. 30, 2020); *Mellaconic IP LLC v. Frontpoint Sec. Solutions, LLC*, Civ. No. 21-0447, D.I. 1 (filed Mar. 26, 2021); *Mellaconic IP LLC v. Wyze Labs, Inc.*, Civ. No. 21-0448, D.I. 1 (filed Mar. 26, 2021); *Mellaconic IP LLC v. Central Sec. Group-Nationwide, Inc.*, Civ. No. 21-0573, D.I. 1 (filed Apr. 26, 2021); *Mellaconic IP LLC v Monitronics Int'l, Inc.*, Civ. No. 21-0574, D.I. 1  (filed Apr. 26, 2021); *Mellaconic IP LLC v. Canary Connect, Inc.*, Civ. No. 21-0944, D.I. 1 (filed June 29, 2021); *Mellaconic IP LLC v. Fantasia Trading LLC*, Civ. No. 21-0945, D.I. 1 (filed June 29, 2021); *Mellaconic IP LLC v. Trane Techs. Co. LLC*, Civ. No. 21-1080, D.I. 1 (filed July 28, 2021); *Mellaconic IP LLC v. Linxup, LLC*, Civ. No. 21-

33

Delaware lawyer with the Chong Law Firm, P.A., is Mellaconic's counsel of record in all 19 cases.  In 18 of the cases, either Howard Wernow or Andrew Curfman entered an appearance as co-counsel.  Messrs. Wernow and Curfman are Ohio lawyers with the law firm Sand, Sebolt & Wernow, LPA.

All told, Mellaconic has filed 44 patent infringement cases in nine federal judicial districts to date.  In all these cases, Mellaconic asserted a single patent, U.S. Patent No. 9,986,435 (the #435 patent), titled "Autonomous, Non-interactive, Content-based Services for Cellular Phone."  In each complaint, Mellaconic claimed that it had "its principal place of business at 6009 West Parker Road – Suite 149-1027, Plano, TX 75093."  That address is in fact an iPostal drop box.

In a declaration submitted in response to the November 10 Memorandum Order, Mr. Bui stated that Mellaconic had seven assets at the time it filed these

---

1081, D.I. 1 (filed July 28, 2021); *Mellaconic IP LLC v. Ezlo Innovation Ltd.*, Civ. No. 21-1373, D.I. 1 (filed Sep. 28, 2021); *Mellaconic IP LLC v. Verkada, Inc.*, Civ. No. 21-1374, D.I. 1 (filed Sep. 28, 2021); *Mellaconic IP LLC v. Incognia US Inc.*, Civ. No. 21-1844, D.I. 1  (filed Dec. 29, 2021); *Mellaconic IP LLC v. Carrier Global Corp.*, Civ. No. 21-1853, D.I. 1 (filed Dec. 30, 2021); *Mellaconic IP LLC v. Connecteam, Inc.*, Civ. No. 22-242, D.I. 1 (filed Feb. 25, 2022); *Mellaconic IP LLC v. PrismHR, Inc.*, Civ. No. 22-243, D.I. 1 (filed Feb. 25, 2022); *Mellaconic IP LLC v. TimeClock Plus, LLC*, Civ. No. 22-244, D.I. 1 (filed Feb. 25, 2022); *Mellaconic IP LLC v. Avast Software, Inc.*, Civ. No. 22-540, D.I. 1 (filed Apr. 27, 2022); *Mellaconic IP LLC v. Deputy, Inc.*, Civ. No. 22-541, D.I. 1 (filed Apr. 27, 2022); *Mellaconic IP LLC v. Justworks, Inc.*, Civ. No. 22-542, D.I. 1 (filed Apr. 27, 2022).

suits: the #435 patent, five other patents, and a patent application.  App. U.  Like

Mr. Hall, Mr. Bui testified at the November 4, 2022 hearing.  And as with Mr.

Hall, Mr. Bui knew nothing about the subject matter or value of Mellaconic's

assets and was hard put to explain how Mellaconic came into possession of them:

> Q.  What does Mellaconic do?
>
> A.  Yeah.  Mellaconic owns patents, the rights to patents.
>
> Q.  All right. How many patents?
>
> A.  I believe six.
>
> Q.  And what types of patents?
>
> A.  I haven't really looked over them.
>
> Q.  Okay. How much did you pay for the patents?
>
> A.  I didn't pay for the patents.
>
> Q.  So how do you come to own patents if you don't pay for them?
>
> A.  I was—came up—someone pushed me with the opportunity, selling the patents.
>
> Q.  Who was that?  Mellaconic?
>
> A.  Mellaconic—no, Mavexar.  Sorry.
>
> Q.  Mavexar.  Well, how did you come in touch with Mavexar?
>
> A.  Linh.

35

Q.  Is this Linh D[ei]tz?

A.  Linh D[ei]tz.

Q.  How do you know her?

A.  She's a friend.

Q.  When did she first approach you about this idea of assuming ownership of patents?

A.  I believe in 2020, right when the pandemic hit.

Q.  And what did she tell you?

A.  She just came up to me and just told me if I would like an opportunity to deal with patents and make passive income.

* * * *

Q.  So it's make a passive income.  What does that mean?

A.  Like, income.  Coming in without, you know—I don't know how to describe it.  Just like, kind of like—

Q.  How about this?  You don't have to do anything; is that fair?

A.  Yeah, you don't have to do much, yeah.

Q.  Well, what do you have to do?

A.  As far as?

36

Q.  As far as getting ownership of the patents.  I assume the patents are worth something, in your mind?  Do you think the patents are worth anything?

A.  Yes.

Q.  All right.  Do you have any sense of how much they're worth?

A.  I'm not an expert in patents.  I wouldn't know.

Q.  Well, did Ms. D[ei]tz or anyone else, when you took ownership of the patents, give you any sense of what they thought the patents were worth?

A.  No.

Q.  Did you have to give up anything in order to assume ownership of the patents?

A.  No, sir.

Q.  Did you have to take on any responsibilities to assume ownership of the patents?

A.  As far as, just like, viewing the litigations and everything that come through.

Q.  Oh, so you do review the litigations?

A.  Yeah.

Q.  Tell me about what you do in that regard?

A.  So Mavexar will send me the litigations of what's going on or the, you know, attorney engagements.  And then I, essentially, if I sign—I approve of them or disapprove of them.

37

Q.  How do you know whether to approve or disapprove of an attorney?

A.  I mean, I chose Mavexar and they're—they're—what is it?—they're good.  Like, you know, they haven't done me wrong.

Q.  Well, so do you get a share, then, of lawsuits or settlements that are brought using these six patents?  Is that how you make money, passive income, as you call it?

A.  Yeah.

* * * *

Q.  What's your share?

A.  With?

Q.  Of the litigation or settlements.  What's your share? Do you get a percentage share?

A.  Percentage.

Q.  And what is it?

MR. WERNOW: Objection, Your Honor. Just confidential business information.

THE COURT: Go ahead.

A.  5 percent.

* * * *

38

Q. . . . What did you have to give up in value for you to be able to assume ownership of these patents?

A. I didn't give nothing.

Q. You didn't give them anything. So they were a gift?

A. No. It's—

Q. So what's the—then help me. I'm just trying to understand this concept. If it's not a gift, you're not paying anything, why is someone giving you these patents?

A. You would have to ask Mavexar that.

Q. Did you take on any liability as a result of assuming ownership of the patents?

A. What do you mean by "liability"?

Q. Well, so you don't know?

A. What's that?

Q. You don't know what "liability" means?

A. I mean, I have a general idea, but . . .[10]

---

[10] The court reporter used these ellipses in the transcript to reflect the fact Mr. Bui trailed off and was silent for a notable, indeed awkward, period. *See* LILLIAN I. MORSON, MORSON'S ENGLISH GUIDE FOR COURT REPORTERS 154 (2d ed. 1997) ("Rule 273. If a remark is intended to trail off without a conclusion, use three spaced periods, as recommended by most manuals as a specific use of the ellipsis points. Often the speaker uses body language to complete the idea: a shrug of the shoulders, extended upturned palms."). It was clear from the substance of Mr. Bui's testimony and his facial expressions and body language that he was not

39

Q. Was there any risk that you assumed when you assumed ownership of the patents?

A. Oh, there's always a risk in everything.

Q. So what's the risk?

A. I mean, if things fall through, then I would have to come out of pocket.

Q. And what kind of things would you have to come out of pocket, is your understanding?

A. So if, like, litigation goes wrong, Mavexar has the right to come after me for the costs of what was loaned.

\* \* \* \*

Q. Who pays for the lawyer fees to go out and sue people using the patents owned by Mellaconic?

A. Mavexar.

Q. And what is—do they loan you the money for that?

A. Yes. It's a recourse.

---

familiar with the word "liability," a term that, as discussed below, *see infra* pp. 42–43, is used in the Patent Assignment Agreement that transferred the #435 patent to Mellaconic and the Consulting Service Agreement Mellaconic had with Mavexar. *See* App. W at 3; App. X at 4. Mr. Bui's electronic signatures (if he in fact made them) on these contracts expose him to potential financial liability. I make note of this example and have quoted extensively from Mr. Bui's testimony because the disparity in legal sophistication between Mr. Bui and the IP Edge and Mavexar actors who dealt with him underscore that counsel's failures to comply with the Model Rules of Professional Conduct while representing Mr. Bui and his LLC in the Mellaconic cases are not merely technical or academic. *See infra* Section VI.

40

Q.  What do you mean by "recourse"?

A.  Like a loan.

Q.  Well, how did you come up with the terms "recourse"?  I'm just—what does that mean?

A.  All I know is it's like a loan.

Civ. No. 22-0244, D.I. 20 at 86:18–89:19; 91:8–14; 94:10–95:12; 96:8–17.

The seven assets identified in Mr. Bui's declaration are listed in a two-page document titled "Patent Assignment" that was electronically filed with the PTO on August 19, 2020 by someone using Linh Deitz's IP Edge email account.  App. V at 1.  The Patent Assignment is electronically signed by Mr. Bui on behalf of Mellaconic and by Thomas Kang on behalf of Empire Technology Development LLC (Empire).  App. V at 4.  According to the terms of the Patent Assignment, on August 10, 2020 (five days after Mellaconic was created), Empire assigned to Mellaconic "for good and valuable consideration . . . *all* right, title, *and interest that exist today and may exist in the future in and to*" the seven listed assets.  App. V at 3.  The Patent Assignment also expressly states that the "right, title, *and interest*" in the seven assets "includ[es] *all income, royalties, damages and payments now or hereafter due or payable with respect thereto*" and "the right to

41

bring any claim, sue, counterclaim, and recover for the past, present and future infringement of" the seven assets.  App. V at 4 (emphasis added).

This last statement in the Patent Assignment stands in contrast with the terms of an 11-page Patent Assignment Agreement produced by Mellaconic in response to the November 10 Memorandum Order.  App. W.  That Patent Assignment Agreement is also between Mellaconic and Empire and, like the two-page Empire/Mellaconic Patent Assignment filed with the PTO, it is dated August 10, 2020 and appears to be electronically signed by Hau Bui and Thomas Kang. App. W at 11.  The Patent Assignment Agreement, however, expressly provides that "[a]s consideration [for the assignment of the assets], [Mellaconic] shall pay [Empire] fifty percent (50%) of the Net Proceeds received by [Mellaconic] as a result of enforcement of" the seven assets.  App. W at 2.

As in the case of the Burley/Nimitz Patent Assignment Agreement, in the Empire/Mellaconic Patent Assignment Agreement, Empire and Mellaconic "agree[d] to execute the form of . . . Patent Assignment[]attached as Exhibit A hereto, the terms of such Patent Assignment being fully incorporated herein." App. W at 1.  The "Exhibit A hereto" is the same two-page Patent Assignment filed by Mellaconic with the PTO on August 19, 2020.

The terms of that Patent Assignment also stand in contrast with the terms of the form "Consulting Services" agreement Mellaconic and Mavexar entered on August 11, 2020. App. X.[11] That agreement is identical to the agreement Mavexar had with Nimitz. As noted above, Mr. Bui testified at the November 4, 2022 hearing that pursuant to that agreement Mellaconic received only five percent of the revenue stream obtained from licensing and litigating Mellaconic's patents. Civ. No. 22-0244, D.I. 20 at 91:5–16. Thus, at the time Mellaconic filed with the PTO an assignment that stated that Mellaconic's "right, title, *and interest*" in the seven assets listed in the assignment "includ[ed] *all* income, royalties, damages and payments now or hereafter due or payable with respect thereto," Mavexar was contractually entitled to 95% of the profits generated from licensing or litigating those assets.

Eight days after the Patent Assignment was filed with the PTO, on August 27, 2020, the first three of the 44 patent cases ultimately brought in Mellaconic's

---

[11] App. X is marked "Common Interest Attorney-Client Privilege," but Mr. Wernow introduced the agreement into evidence at the November 4, 2022 hearing and therefore waived any privilege the agreement might otherwise have enjoyed.

43

name were filed in Texas.[12]  The following week, three Mellaconic cases were

filed in the Southern District of New York.[13]

On September 30, 2020, Mr. Chong filed *Mellaconic IP LLC v. RideCell,*

*Inc.*, Civ. No. 20-1323, in this Court.  Mellaconic's production contains only one

engagement letter for the Chong Law Firm.  App. Y.  The three-page letter is

addressed to "Hau Bui, Managing Member, Mellaconic IP LLC," App. Y at 1, but

it is dated July 14, 2020—roughly three weeks before Mellaconic was formed.

Although there is a place for Mr. Chong's signature on the letter, he did not sign it.

What looks to be an electronic signature for Hau Bui appears below the words

"[u]nderstood and agreed" at the bottom of the letter's third page.  That signature is

dated September 28, 2020.  App. Y at 3.  Mellaconic produced no emails relating

to the Chong Law Firm engagement letter, even though the November 10

Memorandum Order required Mellaconic, Mr. Bui, Mr. Chong and Mr. Chong's

firm to produce "[a]ny and all communications and correspondence, including

emails and text messages, that [Mr. Bui, Mr. Chong, or any employee of Mr.

---

[12] *Mellaconic IP LLC v. Uber Techs., Inc.*, Civ. No. 6:20-cv-785, (W.D. Tex., filed Aug. 27, 2020); *Mellaconic IP LLC v. Lyft, Inc.*, Civ. No. 6:20-cv-786, (W.D. Tex., filed Aug. 27, 2020); *Mellaconic IP LLC v. Via Transport. Inc.*, Civ. No. 3:20-cv-2543, (N.D. Tex., filed Aug. 27, 2020).
[13] *Mellaconic IP LLC v. Curb Mobility, LLC*, Civ. No. 1:20-cv-7089, (S.D.N.Y., filed Aug. 31, 2020); *Mellaconic IP LLC v. GT Gettaxi Ltd.*, Civ. No. 1:20-cv-7091, (S.D.N.Y., filed Aug. 31, 2020).

Chong's law firm] had with Mavexar, IP Edge, Linh D[ei]tz, Papool Chaudhari, and/or any representative of Mavexar and/or IP Edge regarding: . . . the retention of [Mr. Chong's firm] to represent Mellaconic in these cases." Civ. No. 22-0244, D.I. 22 at 2–5.  Accordingly, and since Mr. Bui's signature on the letter appears to be an electronic signature, it cannot be determined if, when, how, or from whom Mr. Bui received the Chong Firm retainer agreement.

On March 3, 2021, Brandon LaPray of IP Edge sent an email addressed to info@ip-edge.com and apparently blind copied to certain law firms.  App. Z.  Like many of the emails in the Mellaconic document production, this email is heavily redacted.[14]  The email's subject line is "New Opps—[REDACTED BY COUNSEL] and Mellaconic."  In the body of the email, Mr. LaPray wrote: "We are looking for lead counsel to handle the below opportunities.  If you are interested or would like to discuss, please let us know."  The unredacted text below this statement reveals a "Mellaconic" Dropbox link and a reference to the #435 patent.  App. Z at 1.  In a March 7, 2021 email response to Mr. LaPray, Mr. Wernow wrote: "We would be interested in handling both matters."  App. Z at 1.

---

[14] Mellaconic heavily redacted the documents it produced in response to my November 10, 2022 Memorandum Order on relevance grounds.  Relevance, however, is not a proper ground for redaction.  *Delaware Display Grp. LLC v. Lenovo Grp. Ltd., Lenovo Holding Co.*, No. CV 13-2108-RGA, 2016 WL 720977, at *6 (D. Del. Feb. 23, 2016).

45

On March 11, 2021, an executive assistant at Sand, Sebolt emailed Ms. Deitz, asking her to "please provide the entity information for Mellaconic (U.S. Patent: 9,986,435) so that I can send over an engagement letter."  App. AA at 4–5.  Ms. Deitz responded with the address of Mellaconic's P.O. Box and Mr. Bui's name; and that afternoon, the executive assistant emailed an engagement letter to Ms. Deitz.  App. AA at 2–4.  On March 12, 2021, Ms. Deitz returned a copy of the engagement letter to Sand, Sebolt with an acknowledgement that appears to be electronically signed by Hau Bui.  App. AA at 1.

The letter, dated March 11, 2021 and signed by Mr. Wernow, purports to "set forth guidelines regarding [Sand, Sebolt's and Mr. Bui's] respective responsibilities" in connection with Sand, Sebolt's "represent[ion] [of] [Mr. Bui's] intellectual property interests and litigation regarding U.S. Patent No. 9,986,435[]."  App. BB at 1, 4.  Under the terms of the letter, Mellaconic agreed to pay Sand, Sebolt on a contingency fee basis.  The fee varies from 15% to 45% of the net proceeds of the "consideration received by [Mellaconic] resulting from lawsuits filed by [Sand, Sebolt]."  App. BB at 1.  The letter provides in relevant part:

> *Third Parties.*  Our services may require us to act as your agent to third parties.  You hereby give us explicit permission to discuss all matters of your case with any third parties, which [sic] you have entered into any type of consulting agreement (i.e., "one of your consultants").  While we use our best judgment in retaining other third

> parties, such as expert witnesses, you agree not to hold us liable for any liabilities or costs arising from any actions by such third parties or one of your consultants. Additionally, you give us explicit authority to disburse distributions of received proceeds to be sent to a third party or one of your consultants in the ordinary course of our relationship.
>
> *Instructions.*  We need you, or one of your consultants, to provide us with full, frank and detailed information. Without it, we are unable to perform our job.  Generally, we will not proceed to act on your behalf until we receive instructions from you or one of your consultants.
>
> * * * *
>
> *Communication.*  We will send all communications to the address you provide us or to one of your consultants. Communication may be via regular mail, facsimile and/or e-mail.  If we cannot reach you because you did not inform us of changes, our duty to act in the matter ceases.

App. BB at 2.  The only discussion related to conflicts of interest in the letter is the statement that Sand, Sebolt "may terminate the engagement if . . . a conflict of interest exists."  There is no discussion in the letter about the risks associated with bringing a patent lawsuit.  Thus, for example, there is no mention in the letter of the fact that under 18 U.S.C. § 285, the court may award in exceptional cases attorney fees to the prevailing party in a patent infringement case.

Mellaconic produced no emails or texts to which Mr. Bui was a party that referenced or attached the Sand, Sebolt engagement letter.  Accordingly, and since

47

the signature for Mr. Bui on the letter appears to be electronic, it cannot be determined from the document production if, when, how, or from whom Mr. Bui was provided the engagement letter or what, if anything, he was told with respect to the letter.

Beginning on March 26, 2021 and extending through April 27, 2022, Mr. Chong, with Sand, Sebolt acting as co-counsel, filed 18 patent infringement cases on Mellaconic's behalf in this Court. All but the two above-captioned Mellaconic cases were settled before I issued my order on September 12, 2022 convening the November 4, 2010 hearing.[15]

---

[15] *See Mellaconic IP LLC v. Linxup, LLC*, Civ. No. 21-1081, D.I. 10 (Sep. 16, 2021); *Mellaconic IP LLC v. Ezlo Innovation Ltd.*, Civ. No. 21-1373, D.I. 9 (Nov. 10, 2021); *Mellaconic IP LLC v. Verkada, Inc.*, Civ. No. 21-1374, D.I. 9 (Nov. 3, 2021); *Mellaconic IP LLC v. Incognia US Inc.*, Civ. No. 21-1844, D.I. 10 (Mar 29, 2022); *Mellaconic IP LLC v. Carrier Glob. Corp.*, Civ. No. 21-1853, D.I. 12 (Apr. 1, 2022); *Mellaconic IP LLC v. Connecteam, Inc.*, Civ. No. 22-242, D.I. 12 (June 24, 2022); *Mellaconic IP LLC v. PrismHR, Inc.*, Civ. No. 22-243, D.I. 9 (Apr. 15, 2022); *Mellaconic IP LLC v. Avast Software, Inc.*, Civ. No. 22-540, D.I. 10 (May 25, 2022); *Mellaconic IP LLC v. Justworks, Inc.*, Civ. No. 22-542, D.I. 12 (July 27, 2022); *Mellaconic IP LLC v. Frontpoint Sec. Solutions, LLC,* Civ No. 21-0447, D.I. 10 (June 1, 2021); *Mellaconic IP LLC v. Wyze Labs, Inc.*, Civ No. 21-0448, D.I. 9 (June 9, 2021); *Mellaconic IP LLC v. Central Security Group – Nationwide, Inc.,* Civ. No. 21-0573, D.I. 10 (June 9, 2021); *Mellaconic IP LLC v. Monitronics, Int'l, Inc.,* Civ. No. 21-0574, D.I. 9 (June 9, 2021); *Mellaconic IP LLC v. Canary Connect, Inc.,* Civ. No. 21-0944, D.I. 8 (Sep. 9, 2021); *Mellaconic IP LLC v. Fantasia Trading LLC,* Civ. No. 21-0945, D.I. 16 (Oct. 5, 2021); *Mellaconic IP LLC v. Trane Techs. Co. LLC,* Civ. No. 21-1080, D.I. 11 (Nov. 10, 2021).

Although Mr. Chong was counsel of record for Mellaconic in *RideCell,* No. 20-1323, and although he filed the motion to voluntarily dismiss that case in March 2021, it appears that he never communicated with Mr. Bui until the November 4, 2022 hearing. Indeed, it appears from Mr. Bui's testimony at the hearing, that Mr. Bui was not aware at that time that Mr. Chong's firm was Mellaconic's counsel. When I asked Mr. Bui at the November 4, 2022 hearing "what attorneys have represented Mellaconic?" He answered: "Sand, Sebolt, as far as I know." I then asked: "Anybody else?" to which he replied: "I would have to go back and look." Civ. No. 22-0244, D.I. 20 at 92:12–16. When Mr. Bui made this statement, Mr. Chong was in his sight line, about 20 feet away at counsel's table.

Based on the Mellaconic document production, it appears that the first direct communication between Mr. Chong and Mr. Bui occurred on November 30, 2022, about three weeks after the hearing. In an email to Mr. Bui on that date, Mr. Chong wrote:

> As you know I represent your business in its patent infringement cases. I have been communicating with it through Mavexar based on you retaining it to represent you. I wanted to reach out to you independently and confirm that you want me to communicate with the Mavexar team directly.

49

App. CC.[16]  Ten days later, Mr. Bui replied: "Yes, you can continue to

communicate to Mavexar team directly."  App. CC.

Although Sand, Sebolt was lead counsel for Mellaconic in 16 cases that were

settled before September 12, it appears that neither Mr. Wernow nor Mr. Curfman

(nor any other lawyer from Sand, Sebolt) had ever spoken with or otherwise

communicated directly with Mr. Bui before those settlements were reached.  Based

on Mr. Bui's testimony at the November 4, 2022 hearing and the Mellaconic

document production, it appears that Mr. Bui's first communication with a lawyer

from Sand, Sebolt occurred on October 10, 2022 during a prep call for the

November 4, 2022 hearing that included Messrs. Chaudhari and Bodepudi from IP

Edge.  App. DD.[17]  It also appears that Sand, Sebolt did not have Mr. Bui's email

address until November 3, 2022, when Mr. Chaudhari provided it to Mr. Curfman

at Mr. Curfman's request.  App. EE at 2–3.[18]  A Sand, Sebolt executive assistant

---

[16] The emails in App. CC are marked privileged, but because they merely communicate the general terms of Mr. Chong's representation of Mellaconic, they are not privileged.  *Idenix Pharms.*, 195 F. Supp. 3d 639 at 643; *see also Avgoustis*, 639 F.3d at 1344.

[17] The emails in App. DD are marked "Common Interest Attorney-Client Privilege," but they do not disclose a communication to or from a client.  They are therefore not attorney-client communications, let alone privileged attorney-client communications.

[18] The emails in App. EE are marked "Common Interest Attorney-Client Privilege."  The subject matter of the emails is travel arrangements for the

then used the email address later that day to send Mr. Wernow's contact

information and travel itinerary for the November 4 hearing to Mr. Bui. App. EE

at 1. Hours later, Mr. Bui texted Mr. Wernow to let him know he was "headed to

the airport." App. FF. This text appears to be the first direct communication Mr.

Bui had with a Sand, Sebolt lawyer that did not involve someone from IP Edge.

Using leading and loaded questions at the November 4 hearing, Mr. Wernow

tried to adduce evidence that Mavexar had sent Mr. Bui and Mr. Bui had reviewed

and approved the complaints that Sand, Sebolt filed under Mellaconic's name:

> Q. And what's your recollection of the complaints
> that our office, or Mr. Curfman, has sent to you
> through Mavexar, you review those—
>
> THE COURT: Object to leading. Ask him what
> he does.
>
> BY MR. WERNOW:
>
> Q. What do you do from Mavexar when someone
> sends you a complaint?
>
> A. What was that?

---

November 4, 2022 hearing, not legal advice. But in any event, the emails' authors
and recipients include IP Edge and Mavexar actors who appear to have engaged in
the unauthorized practice of law in Texas; and therefore, even if the emails were
otherwise privileged communications, they would fall within the crime/fraud
exception to the attorney-client privilege. *In re Grand Jury Investigation*, 445 F.3d
at 274.

> Q.  What do you do for Mellaconic IP, LLC, when you receive a complaint?
>
> A.  I review it and I either confirm it or deny it.
>
> Q.  And you can deny it, correct?
>
> A.  I can deny it.

Civ. No. 22-0244, D.I. 20 at 106:12–25.  I wondered at the time I observed this colloquy whether Mr. Bui understood what a complaint was, and I questioned at the time in my own mind whether Mr. Bui had in fact been provided and asked to review the complaints filed under Mellaconic's name in these cases.  As noted above, when I asked Mr. Bui if he took on any responsibilities by assuming ownership of patents, he responded "As far as, just like, viewing the litigations an everything that come[s] through."  I was confused by this answer, so I asked in follow-up: "Oh, so you do review the litigations?" to which Mr. Bui replied, "Yeah."  I then asked: "Tell me about what you do in that regard?"  And Mr. Bui replied:

> So Mavexar will send me the litigations of what's going on or the, you know, attorney engagements.  And then I, essentially, if I sign—I approve of them or disapprove of them.

Civ. No. 22-0244, D.I. 20 at 89:1–9. My take from Mr. Bui's testimony was that his "review of litigations" filed on behalf of his LLCs consisted of signing off on attorney engagement letters.

Mellaconic's document production seems to confirm my suspicion that Mr. Bui was not provided with complaints before Sand, Sebolt filed them. The November 10 Memorandum Order required Mellaconic to produce any and all communications Mr. Bui had with Sand, Sebolt and Mavexar relating to the #435 patent (which is the only patent asserted by Mellaconic in the complaints it filed in these cases). Mellaconic, however, produced no communications with Mr. Bui that attached or discussed complaints.

It also appears from the document production that Mr. Bui was neither apprised of settlement offers made by TimeClock Plus LLC (TimeClock) nor given advance notice of the settlement that led Mr. Chong to move to dismiss the TimeClock case. A May 19, 2022 email from Mr. Curfman to Mr. LaPray confirms that TimeClock and Mr. Curfman each had made at least two settlement offers as of that date:

> Hi Brandon,
>
> Just spoke to [TimeClock's] counsel on this one. They raised their offer to $20k. Here's the history: We opened at 85, they countered at 15, we matched and lowered to 70k and hinted in the 40-45 range. They just came back

at 20k and said there is probably a bit more room but OC
doubts that they will be able to get into the 40k+ range.  I
told him "officially we are still at 70 and I'm 99.9% if we
can get to a number starting with a '4' that we are done.
If we can get to a number starting with a '3', I feel like
we can probably get that done but I am not as confident.
Below that, I don't know how my client will respond.

\* \* \* \*

Respectfully,

Andrew S. Curfman

App. GG.[19]  Mr. LaPray responded less than an hour after he received Mr.

Curfman's email: "We're ok with your suggestion."  App. GG.  On July 13, 2022,

Messrs. Curfman and Chong filed a Motion to Stay and Notice of Settlement in the

Timelock case, stating that "[a]ll matters in controversy between [the parties] have

been settled in principle."  Civ. No. 22-0244, D.I. 12.  The next day, Mr. Curfman

sent this email to Mr. LaPray:

I just wanted to update you on this case.  We have an AIP
[agreement in principle] at $26,250 based on splitting the
difference between their $22,500 offer and our most

---

[19] This email is marked "confidential attorney work product," but for the reasons
stated above, *supra* note 8, the crime/fraud exception applies.  In any event, I have
redacted from the email all text that could arguably be read as revealing the mental
impressions of Mr. Curfman.  *See In re Cendant Corp. Sec. Litig.*, 343 F.3d 658,
661–62 (3d Cir. 2003) (holding the attorney work-product doctrine "shelters the
mental processes of the attorney, providing a privileged area within which he can
analyze and prepare his client's case") (citing *United States v. Nobles*, 422 U.S.
225, 238 & n.11 (1975)).

> recent $30k offer.  You had previously given authority at
> $20k so we were able to get them up over that here.

App. HH.[20]  Mellaconic produced, however, no communications from, to, or

copying Mr. Bui that make mention of any settlement offer from TimeClock.  Nor

are there any documents from, to, or copying Mr. Bui that show that he consented

to settling the case for $20,000 before Mr. Curfman reached an agreement in

principle with TimeClock.

IV.

I turn next to the two Lamplight cases.  Lamplight has no employees, and its

sole owner and member is Sally Pugal.  It is apparent from the Lamplight

document production that Linh Deitz obtained an address for Lamplight and filed

Lamplight's certificate of formation with the Texas Secretary of State.  App. II;[21]

App. JJ.  The Secretary of State approved the certificate and created Lamplight

effective November 17, 2021.  App. JJ at 1.

---

[20] The email is marked "attorney client privilege" but there has been no assertion of
an attorney client relationship between Sand, Sebolt and IP Edge/Mavexar.
[21] App. II is an email marked "Attorney-Client Privilege and/or Common Interest
Attorney-Client Privilege."  The email, however, does not disclose a
communication to or from a client and therefore it is not an attorney-client
communication, let alone a privileged attorney-client communication.

Mr. Chong filed six patent infringement cases in Lamplight's name in this district, including the two at issue here, between November 30, 2021 and July 31, 2022.[22]  Mr. Chong is Lamplight's sole counsel of record in these cases. Lamplight asserted in all six cases a single patent: U.S. Patent No. 9,716,393 (the #393 patent).[23]  The patent is titled "Battery Backup Remaining Time Arrangement."  According to the complaints, the patent "provide[s] an apparatus and associated systems and methods for reducing current consumption from a battery."  Civ. No. 21-cv-1689, D.I. 1 at 3.  Lamplight claimed in each complaint that "its principal place of business [is] located at 3571 Far West Blvd #3144, Austin, TX 78731."  That address is in fact an iPostal drop box.  App. II.

According to a declaration signed by Ms. Pugal, Lamplight's assets at the time it filed these suits consisted of the #393 patent and U.S. patent application number 61/777445.  App. KK at 2.  These assets are the only items listed in a Patent Assignment filed with the PTO in Lamplight's name on November 30, 2021

---

[22] *Lamplight Licensing LLC v. ABB Inc.*, Civ. No. 22-cv-418; *Lamplight Licensing, LLC v. Cyberpower Sys., Inc.*, Civ. No. 21-cv-1689; *Lamplight Licensing, LLC v. Ingram Micro, Inc.*, Civ. No. 22-cv-1017; *Lamplight Licensing, LLC v. Legrand AV, Inc.*, Civ. No. 21-cv-1691; *Lamplight Licensing LLC v. Panduit Corp.*, Civ. No. 22-cv-417; *Lamplight Licensing, LLC v. Vertiv Holdings Co.*, Civ. No. 21-cv-1690.
[23] Civ. No. 22-cv-418, D.I. 3; Civ. No. 21-cv-1689, D.I. 3; Civ. No. 22-cv-1017, D.I. 3; Civ. No. 21-cv-1691, D.I. 3; Civ. No. 22-cv-417, D.I. 3; Civ. No. 21-cv-1690, D.I. 3.

by someone using the email address sallypugal55@gmail.com.  App. LL.  The
two-page assignment is between Magnolia Licensing LLC (Magnolia) and
Lamplight and has an effective date of November 19, 2021.  It bears the label
"Exhibit A" in the top left corner of both pages and appears to be electronically
signed by Lori LaPray on behalf of Magnolia and Sally Pugal on behalf of
Lamplight.  App. LL at 2–3.

Under the terms of the Patent Assignment, "[f]or good and valuable
consideration," Magnolia "assign[ed], transfer[red], and convey[ed] unto
Lamplight . . . *all* right, title, *and interest that exist today and may exist in the
future*" in the #393 Patent and U.S. patent application number 61/777445.  App.
LL at 1.  The assignment goes on to state that "all of the rights, . . . title and
interest" in the patent and patent application "includ[e] *all* income, royalties,
damages and payments now or hereafter due or payable with respect thereto."
App. LL at 1 (emphasis added).

Here again a Patent Assignment Agreement produced in response to the
November 10 Memorandum Order stands in contrast with the Assignment filed
with the PTO.  That seven-page agreement, like the Magnolia/Lamplight Patent
Assignment filed with the PTO, appears to be electronically signed by Sally Pugal
on behalf of Lamplight and Lori LaPray on behalf of Magnolia and has an

57

effective date of November 19, 2021. App. MM at 4–5. As in the case of the

Burley/Nimitz and Empire/Mellaconic Patent Assignment Agreements, in this

Patent Assignment Agreement, Magnolia and Lamplight "agree[d] to execute the

form of . . . Patent Assignment[]attached as Exhibit A hereto, the terms of such

Patent Assignment being fully incorporated herein." App. MM at 1. And as with

Nimitz and Mellaconic, the "Exhibit A hereto" is the Patent Assignment filed by

Lamplight with the PTO. App. MM at 7–8. Finally, paragraph 4 of the

Magnolia/Lamplight Patent Assignment Agreement, titled "Consideration,"

provides:

> [Lamplight] agrees to comply with and be bound by the
> terms and conditions of the Patent Assignment
> Agreement between Thomson Licensing SAS ("TLS")
> and Magnolia Licensing LLC, with an effective date of
> July 2, 2020 ("Prior Agreement"), including that the
> Contingency Payments referenced in the Prior
> Agreement will continue to be due to TLS. [Lamplight]
> also understands and acknowledges that [Magnolia] or
> prior owners may have granted licenses, covenants not to
> sue, releases and other encumbrances with respect to the
> [#393 patent and U.S. patent application number
> 61/777445] ("Patent Encumbrances"). [Lamplight]
> expressly agrees to be bound by and take the [the #393
> patent and U.S. patent application number 61/777445]
> subject to all such Patent Encumbrances.

App. MM at 3.

58

Lamplight did not produce a copy of the Prior Agreement between Thomson Licensing and Magnolia or any email or written communication about that agreement, even though the November 10 Memorandum Order required it to produce "any and all communications and correspondence, including emails and text messages, that Sally Pugal had with Mavexar, Linh D[ei]tz, Papool Chaudhari, Brandon LaPray, and/or any representative of Mavexar regarding . . . assets, including patents, owned by Lamplight." Accordingly, I do not know the terms of the contingency payment Lamplight owed to Thomson Licensing at the time it filed the Patent Assignment with the PTO or the particulars of the "other encumbrances" Lamplight "underst[ood] and acknowledge[d] that [Magnolia] or prior owners may have granted." But even if there were no "other encumbrances" on the #393 patent and U.S. patent application number 61/777445 as of November 30, 2021, Lamplight's assumption of a preexisting contingency payment obligation stands in contrast to the representation in the Magnolia/Lamplight Patent Assignment filed on that date with the PTO that Lamplight was entitled to "all income, royalties, damages and payments now or hereafter due or payable" from the monetization of the #393 patent and U.S. patent application number 61/777445 patent.

59

The day after Ms. Pugal executed the Magnolia/Lamplight Patent Assignment Agreement, she entered into a consulting contract with Mavexar. App. NN.  The terms of that agreement are identical to the terms of Nimitz's and Mellaconic's agreements with Mavexar; and thus, for the reasons discussed above, Lamplight's agreement with Mavexar also appears at odds with the representation Lamplight made to the PTO that it possessed "all right, title, *and interest*" in "*all* income, royalties, damages and payments now or hereafter due or payable" from the monetization of the #393 patent and U.S. patent application number 61/777445 patent. *Compare* App. LL at 2 *with* App. NN at 2.  Because, as discussed more fully below, Ms. Pugal did not appear for questioning at the November 4, 2022 evidentiary hearing, I do not know the percentage of licensing revenues Mavexar retains under its agreement with Lamplight.

On November 30, 2021 Mr. Chong filed the first three patent infringement cases in Lamplight's name in this Court.  Civ. No. 21-cv-1689; Civ. No. 21-cv-1690; Civ. No. 21-cv-1691.  Mr. Chong insists that his client in these cases is Lamplight.  Assuming for argument's sake that at some point he had an attorney-client relationship with Lamplight, it is unclear that that relationship existed at the time Mr. Chong filed these three cases.  I tried at the November 4, 2022 hearing to gain clarity about the genesis of Mr. Chong's relationship with Lamplight:

60

THE COURT: All right. How did you come to be the lawyer representing Lamplight? How did you first hear about Lamplight? Who talked to you from Lamplight because—for instance, when did you first speak with Ms. Pugal?

\* \* \* \*

MR. CHONG: I did not speak with her before I filed these cases. Mavexar had reached out to me on her behalf. And we had communicated through Mavexar, and had our fee agreement, and so forth, signed as Mavexar was acting as a representative of Ms. Pugal.

THE COURT: So you are representing an entity that's exclusively owned by somebody, and you signed a retention letter with whom? With Lamplight?

MR. CHONG: Yes.

THE COURT: And you had never met the owner of Lamplight when you signed the retention letter, is what you're telling me?

MR. CHONG: That is correct.

THE COURT: And, in fact, it sounds like you never had any discussions with the owner of Lamplight when you signed the retention letter with Lamplight.

MR. CHONG: I did not speak with her directly. I spoke with the representatives.

THE COURT: Her representative who's not an employee of Lamplight. This is a consulting firm, a separate entity; is that right?

MR. CHONG: That is correct.

61

THE COURT: Okay.  It's Mavexar.

MR. CHONG:  That is correct.

THE COURT:  All right.  Do you know what the rules of ethics are about having a relationship with a client that is initiated by a third party?

I'm trying to think of any other context, so help me out.  I'm just trying to think what rules would be applicable.  I'm not judging.  I'm asking questions here.

But I'm trying to understand how you end up in an attorney-client relationship with an LLC that is exclusively owned by an individual that you have never met and you've had no conversations with an employee of the LLC, and yet you end up in an attorney-client relationship with the LLC.

Do you know what rules would be implicated by that?

MR. CHONG:  So Your Honor, I have to stop and think.

THE COURT:  How did you run conflicts?  I mean, I'm just trying to think how you would run conflicts when you're dealing with a third party that's negotiating with you to set up an attorney-client relationship with somebody else, another entity.

I'm trying to figure out how you run conflicts.  Did you run conflicts?

MR. CHONG:  Yes, Your Honor.

THE COURT:  And it's all based on representations from a third party, not from the client, correct?

MR. CHONG:  That is correct, Your Honor.

62

> THE COURT:  All right.  So when did you enter the relationship with Lamplight?  Ballpark.
>
> MR. CHONG:  I would have to find my fee agreement.

Civ No. 22-0418, D.I. 23 at 9:16–12:11.

Mr. Chong was unable to find his fee agreement during the hearing.  The November 10 Memorandum Order required Lamplight and Mr. Chong's firm to produce "[a]ny and all retention letters and/or agreements between Lamplight and The Chong Law Firm, P.A." and "[a]ny and all communications and correspondence, including emails and text messages, that [Sally Pugal, Mr. Chong, or any employee of Mr. Chong's law firm] had with Mavexar, IP Edge, Linh D[ei]tz, Papool Chaudhari, and/or any representative of Mavexar and/or IP Edge regarding: . . . the retention of [Mr. Chong's firm] to represent Lamplight in these cases."  No. 22-0418, D.I. 24 at 3–4.  The sole retainer agreement between Lamplight and Mr. Chong's firm in Lamplight's document production says that it was "made this 28th day of March, 2022"—that is, about four months after Mr. Chong filed the first three Lamplight cases in this Court and one month after he filed a motion to voluntarily dismiss one of those cases.  *See* App. OO at 8; Civ. No. 21-cv-1690, D.I. 9.  (Lamplight produced two copies of this agreement.  The copies are identical save that one copy is signed by both Mr. Chong and Ms. Pugal, while the other copy is signed by only Ms. Pugal.  *See* App. OO; App. PP.)

63

An email from Mr. Chong's paralegal to Linh Deitz, however, suggests that more than a month after March 28, 2022 Mr. Chong still did not have a written retainer agreement with Lamplight. The email in question was sent on May 10, 2022, and it reads in relevant part:

> Hey Linh –
>
> Just wanted to check on Engagement Letters for the following:
>
> - Backertop Licensing LLC (Local)
> - Ridgeview IP LLC (Lead)
> - Waverly Licensing LLC (Lead)
> - Lamplight Licensing LLC (Lead)
> - Creekview IP LLC (Lead)
> - Topdown Licensing LLC (Lead) . . . .

App. QQ. Lamplight did not produce any responses to this email. And even though Mr. Chong insisted at the November 4, 2022 hearing that he negotiated the terms of the March 28, 2022 retainer agreement with Mavexar and "went through a lot of redlining" during those negotiations, Civ No. 22-0418, D.I. 23 at 26:6–7, other than the May 10, 2022 email from Mr. Chong's legal assistant to Ms. Deitz, there are no emails or other written communications in Lamplight's production that discuss Lamplight's retention of the Chong Firm or refer to the March 28, 2022 retention agreement or any draft of a retention agreement.

Putting aside for the moment the question of when Mr. Chong's retainer agreement with Lamplight was executed, the substance of the agreement is

64

noteworthy in several respects. First, the agreement defines the "Scope of the

Agreement" as "concern[ing] litigation and licensing activities with respect to" the

#393 patent. App. OO at 1. Second, and in apparent conflict with the

Magnolia/Lamplight Patent Assignment Agreement discussed above, in section 2

of the retainer agreement Lamplight

> represent[ed] and warrant[ed] that it own[ed] full, clear
> and unencumbered title and the exclusive right to enforce
> all rights with respect to the [#393 patent], including,
> without limitation, the exclusive right to bring actions
> against others for infringement of the [#393 patent], to
> license and sublicense the [#393 patent] and to collect all
> royalties (past or future), license fees, profits or other
> revenue or valuable consideration to be paid or
> exchanged by anyone else for the right to use the [#393
> patent]. . . .

App. OO at 1. Third, consistent with the Model Rules of Professional Conduct,

*see infra* Section V, the agreement explicitly states that Mr. Chong's firm "may file

a Lawsuit pursuing claims for infringement of the [#393 patent]" only "after

consultation with and approval of [Lamplight]," App. OO at 2; that Mr. Chong's

firm "agrees not to enter into any Licensing Agreement or Lawsuit settlement with

an Infringer without the written consent of [Lamplight]," that Lamplight "shall

have the sole and exclusive right to approve, accept and enter into any Licensing

Agreement or Lawsuit settlement," and that Mr. Chong's firm "agrees to make

65

reasonable efforts to keep [Lamplight] informed as to the status of all Lawsuits."
App. OO at 2.

Fourth, the agreement provides that Mr. Chong's firm will be paid "on a
contingent fee basis" that entitles the firm to 15% of "any sums [obtained] by way
of licensing, settlement, trial or otherwise with respect to" the #393 patent minus
"Litigation Expenses." App. OO at 2–3. With respect to Litigation Expenses,
section 10 of the agreement states:

> Litigation Expenses exceeding $500 (e.g.[,] deposition
> and hearing transcripts and expert witness and consultant
> fees) will ordinarily be billed directly to [Lamplight] by
> the vendor providing those services. NWM will obtain
> written pre-approval from [Lamplight] for any Litigation
> Expense expected to exceed $500. NWM will exercise
> its reasonable judgment and best efforts to limit the
> Litigation Expenses to only those expenses that it
> considers appropriate and necessary under the
> circumstances.

App. OO at 4. At the November 4 evidentiary hearing, Mr. Chong said he
"remember[ed] negotiating th[e] specific sentence" that "NWM will obtain written
pre-approval from [Lamplight] for any Litigation Expense expected to exceed
$500," and that it was "a sticking point for [him]." Civ No. 22-0418, D.I. 23 at
22:14–23:6. He was, however, unable to identify what or who NWM was:

> THE COURT: So who's NWM? Who's deciding this?
> Who is deciding, in other words, how you're going to, or

66

> whether, really, you're going to have certain litigation expenses paid for?
>
> MR. CHONG:  You know what, I have to go back and look at my notes.  Because that's something where [Mavexar and I] would determine together.  We would have that discussion.  I mean, I just know there's a lot of back and forth with this—
>
> THE COURT:  Well, let me ask you this: Is there any chance that NWM is Mavexar or some other third-party entity?
>
> MR. CHONG:  No.  I would not have let them ma[k]e that decision. That was—I know I was going back and forth with them.  And it was discussed—
>
> THE COURT:  And "them."  Now, we're not talking Lamplight.  The "them" here is Mavexar; is that right?
>
> MR. CHONG:  That is correct.  They're speaking on behalf of Lamplight.

Civ No. 22-0418, D.I. 23 at 25:5–23.  The acronym "NWM" does not appear anywhere in the documents produced by Lamplight other than in the March 28, 2022 retainer agreement.  Accordingly, section 10 of the retainer agreement remains a mystery.

Fifth, the retainer agreement states that Mr. Chong's firm "is being engaged by, and will represent only [Lamplight], and no other entity or person in connection with Licensing Negotiations and Lawsuit, unless agreed to by [the] [f]irm in writing."  App. OO at 6.  Sixth, the agreement provides that the Chong

67

Firm and Lamplight agree to submit any disputes arising from the firm's legal representation of Lamplight to binding arbitration.  App. OO at 6.

Finally, under the heading "Required Special Disclosures," the retainer agreement states:

> (a)   [LAMPLIGHT] ACKNOWLEDGES THAT IT WAS ADVISED TO RETAIN INDEPENDENT LEGAL COUNSEL TO REPRESENT [LAMPLIGHT] IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT, AND WITH RESPECT TO THE ARBITRATION CLAUSE ABOVE.  [LAMPLIGHT] FURTHER ACKNOWLEDGES THAT IT WAS ADVISED THAT [THE CHONG] FIRM HAS A CONFLICT OF INTEREST THAT PREVENTS IT FROM REPRESENTING CLIENT IN ANY WAY WITH RESPECT TO THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT [THE CHONG] FIRM HAS NOT DONE SO.

> (b)   [Lamplight] acknowledges that prior to signing this Agreement, [Lamplight] was given the option of retaining Firm to handle the Licensing Negotiations and/or Lawsuit on the basis of a normal hourly rate (plus costs and expenses incurred) but elected instead to retain [the Chong] Firm pursuant to the terms and conditions of this Agreement.

> (c)   [Lamplight] acknowledges that it has been advised that submission to binding arbitration typically results in the waiver of significant rights, including the waiver of the right to file a lawsuit in a different venue, waiver of the right to a jury trial, the possible waiver of broad discovery, and the loss of the right to appeal.

App. OO at 7 (capitalization in the original).  It is undisputed that Mr. Chong was the only lawyer from his firm who worked on Lamplight matters and that as of March 28, 2022 he had never communicated with Ms. Pugal directly.  It is thus undisputed that prior to March 28, 2022 no lawyer from Mr. Chong's firm ever (1) advised Ms. Pugal to retain independent legal counsel in connection with the negotiation of the retainer agreement or the arbitration provision in the retainer agreement, (2) advised her of any conflict of interest Mr. Chong's firm had, (3) offered her the option of retaining the Chong Firm on an hourly basis, or (4) advised her that by submitting to binding arbitration she was waiving significant rights.

It appears that Mr. Chong never communicated directly with Ms. Pugal until sometime in October 2022—about a month after I ordered Mr. Chong and Ms. Pugal to appear in person on November 10, 2022 for an evidentiary hearing. Civ. No. 22-cv-418, D.I. 13.  As best I can tell from Lamplight's document production, Ms. Pugal first learned that she had been ordered to appear in court from Linh Deitz on Thursday, September 29, 2022.  On that date, Ms. Deitz texted Ms. Pugal: "Hey Sally, can you talk? . . . It's about one of your companies and it's pretty important.  Call me when you can please."  Ms. Pugal replied: "I will call right now.  CP [the initials of the surgeon Ms. Pugal worked for] is out now."

App. RR.  No follow-up texts for that day were produced by Lamplight, but a few hours after Ms. Pugal's reply text, Ms. Deitz sent an email to Mr. Chong, cc'ing Messrs. Chaudhari and Bodepudi, asking: "Are you available on Wednesdays anytime between 10 am – noon CST to have a 60[-]minute call with our team and Sally to discuss the Connolly hearing?  Unfortunately, that is the only day and times [Ms. Pugal] has available to talk every week."  App. SS at 2.[24]

Just after midnight the following Monday, October 3, 2022, Mr. Chong emailed Ms. Deitz that he could make a call on October 5 at noon.  App. SS at 1. Hours later, Ms. Deitz emailed Ms. Pugal, cc'ing Messrs. Chaudhari and Bodepudi (but not Mr. Chong), with a calendar invite for a call at that time "to discuss the Connolly hearings . . . with our team and your lead counsel Jimmy Chong."  App. TT.  About two hours later, in a separate email to Mr. Chong and his legal assistant, cc'ing Messrs. Chaudhari and Bodepudi (but not Ms. Pugal), Ms. Deitz sent the same calendar invite.  App. TT.  (Sending separate emails appears to have been IP Edge's general practice.  It is readily apparent from the emails and texts

---

[24] The emails in App. SS are marked "Attorney-Client Privilege and/or Common Interest Attorney-Client Privilege."  Because Messrs. Chaudhari and Bodepudi are parties to the emails and because there is *prima facie* evidence that Messrs. Chaudhari and Bodepudi were engaged in the unauthorized practice of law in Texas, the emails fall within the crime/fraud exception to the attorney-client privilege.  *In re Grand Jury Investigation*, 445 F.3d at 274.

produced in response to the November 10 Memorandum Order that IP Edge strove to maintain a separation between the nominal owners of the plaintiff LLCs and the lawyers who filed cases on behalf of those LLCs.)

It is clear from the text messages and emails produced by Lamplight that Ms. Pugal did not want to travel to Delaware for a court hearing and did not want to participate in the weekly Wednesday calls Ms. Deitz had scheduled.  In a series of text messages with Ms. Deitz between September 30 and October 3, 2022, Ms. Pugal said first that she could not travel to Delaware the week of November 10 because her boss had three surgeries scheduled for that week and then that "I don't think I can make it for the rest of the year." Ms. Deitz offered to "see if they can reschedule to another day," and suggested as a possibility November 4, the date of the Nimitz and Mellaconic hearing.  App. UU.

Three hours before the scheduled weekly call on October 5, Ms. Deitz and Ms. Pugal exchanged the following texts:

> Deitz:  Can you talk?  I want to talk to you before your call with our team. . . .  I know this is inconvenient for you but this is very important.

> Pugal:  Hi Linh.  I don't think I will do it.  I will have to cancel.  I'm so sorry.

> Deitz:  *Sally this not only affects you but also our company.*  There are fees that can be charged to you from the court.  We are try[ing] to make it work with your

71

> schedule but you have to work with us.  This is not
> something to take lightly.  This is an order from a federal
> judge.  Sally please call me back.
>
> Pugal:  Sorry Linh.  I am on the phone with facility.  I
> will call in a few.
>
> Deitz:  Ok.

App. VV at 1–5.

The text thread next picks up immediately after Ms. Pugal participated in the

October 5 call:

> Deitz:  Do you feel better after the call?
>
> Pugal:  We just finish[ed.] . . . .  It went well[.]  Very
> informative and very nice people.  About the date I will
> let you know in the morning[.]  Is that ok?  I feel much
> better now.  Thank you.
>
> Deitz:  I'm glad it went well.  You please let me know by
> tomorrow morning.

App. VV at 5–7.  It cannot be determined from the documents who besides Ms.

Pugal participated in the call.

The next day, October 6, Ms. Deitz texted Ms. Pugal: "Did you decide

which day you can go—11/4 or 11/10.  Papool and counsel are asking."  Ms. Pugal

told Ms. Deitz she could go to a hearing on November 4.  App. VV at 8–11.

Five days later—on October 11, 2022—Ms. Deitz renewed her texting with

Ms. Pugal:

> Hey Sally[.]  Jimmy (your counsel) is going to try to call
> or email you.  I told him to reach you best by email and
> to include me and Papool.  I told him you rarely answer
> your phone at work.  I think it's in regards to trying to
> push your date to 11/4.  I think [h]e is trying to get more
> of an understanding of your work to try and get it pushed
> up.

App. WW.  About an hour later, Mr. Chong emailed Ms. Pugal, copying Ms.

Deitz, Mr. LaPray, Mr. Chaudhari, Ms. Maher, and the general IP Edge email

address:

> Hi Sally:
>
> I hope you are well.  I am preparing a letter to the Court
> to let it know you cannot make 11/10 but can make 11/4.
> I want to ask some questions, are you available for a 5-10
> min call? . . .
>
> Jimmy Chong, Esq.

App. XX at 3.  This appears to be the first email communication, and perhaps the

first direct communication of any kind, that Mr. Chong had with Ms. Pugal.  As of

this date, Mr. Chong had filed six cases in Lamplight's name and moved to dismiss

four of those cases.

Ms. Pugal emailed Mr. Chong back and the two spoke by phone later that

day.  At 6:44 p.m., Mr. Chong sent the following email with an attachment to Ms.

73

Pugal, cc'ing Mr. Chaudhari, Ms. Deitz, Mr. LaPray, and Danae Maher:

> Sally:
>
> Thanks for speaking with me, please confirm I have represented the facts correctly.  I have cc'd your representatives on this email as well.  If anyone has any concerns with the attached please let me know.  Otherwise please confirm and we will get this on file by 10/12.
>
> Thanks.
>
> Very truly yours,
>
> Jimmy Chong

App. XX at 1.  Lamplight did not produce any responses to the email, but the day after the email was sent (October 12), Mr. Chong filed a letter with the Court, requesting that I include the Lamplight cases at the November 4 Nimitz/Mellaconic hearing to accommodate the work schedule of Ms. Pugal.  Civ. No. 22-0418, D.I. 17; Civ. No. 22-1017, D.I. 13.  (I granted the request on October 17, 2022.)

Ms. Deitz's texts to Ms. Pugal on October 12 make clear that Ms. Pugal did not participate in the weekly noon call scheduled for that day:

> Deitz:  Hey Sweetie—you missed your call today.  Can you talk to them later today?  Can you talk at 1 pm today?
>
> Pugal:  Sorry I have extremely busy since this morning on the phone[.]  I was ready to join the call but I had another important call for [Ms. Pugal's boss].  I don't

74

think I can join at one[.]  I ha[ve] to leave at 1230 for a
very important Doctor's appointments.  Need to
reschedule[.]  Sorry.

Deitz:  Ok no worries[.]  I will let the team know.  You
will be in the email reply.  I will ask that we resume next
week for your weekly call.

Pugal:  Thank you Linh.

App. YY.

The morning of the following Wednesday, October 19, Ms. Pugal initiated

this text exchange with Ms. Deitz:

Pugal:  Good Morning Linh!  I am so sorry but I won't be
able to make on the meeting today again[.]
Our surgery cancelled last minute and [Ms. Pugal's boss]
is here[.]  I'm leaving early too for doctors
appointment[.]  I hate to do this but let me just [be]
honest with you[.]  I don't think I am comfortable of
doing this trial[.]  I have nightmares almost every night
thinking about it and so stressed[.]
    Already so stressed at work and all of this Doctors
appointments my [Primary Care Physician] order X-rays
MRI and CT[.]  Sorry Linh[,] I cannot do it.

Deitz:  Sally I appreciate you being honest with me but
we already have all the travel arrangements made and I
too am going with you.
    Can you talk to me or Papool right now?
    You mention you are having to go to the doctor for
yourself, are you ok?
    What time are you leaving today to go to your
doctor's appointment?

75

Pugal:  Not really Linh[.]  I can't at this time[.]  [Ms. Pugal's boss] is here[.]  I also received a call from sister in California last night[.]  My brother not doing well in Las Vegas and can't even go.

Deitz:  Oh no[.]  Sorry to hear about your brother.  Please call me when you leave the office.

Pugal:  Thank you.

Ms. Deitz resumed the text thread the next morning (October 20):

Deitz:  Hey Sally have you talked to your doctor yet?  It does not look like we can get out of the 11/4 date.  Papool said— "This judge isn't going to rest until Sally appears in his courtroom in Delaware.  [A]nd if she doesn't appear on 11/4, a date she requested, there's probably going to be sanctions."
    *Sanction means fees that you will be charged to pay (I mentioned that to you last night).*  Unfortunately the judge is a prick and there is not telling how much fees there could be.  *We['v]e paid fees before and I promise you it's a lot.  Don't want to scare you but you need to be fully aware.*

Pugal:  I have been so busy this morning[.]  I will call during my lunch[.]  I understand there is a fee[.]  *Whatever the fee is going to be I don't have that kind of money[.]*
    *Linh[,] you know that I don't even make money on any of the company[ies] including this*[.]  I will ask my doctor and see[.]  If she can write me a letter that I can't travel[.]  Because of my medical problem[.]

Deitz:  *I know you don't have that kind of money, that is why I'm trying to explain the severity of not going.*  With the letter from doctor, it will not change you having to come.  I will be on a call at [noon] and they are going to

76

> discuss it more to me.  We will more likely need to
> schedule a call with you and someone from my team to
> help ease your concerns. . . .
>
> Pugal:  Please do the best you can for me[.]  I already
> made up my mind[.]  sorry I can't do it.
>
> Deitz:  *Sally[.]  I'm sorry but you can't do that.  You put
> not only fees that you will have to pay but you put my
> company at risk.  You are putting me in a really tight
> spot.*

App. ZZ (emphasis added).

From October 21 to October 25, 2022, Ms. Deitz repeatedly texted Ms.

Pugal, asking her to call Ms. Deitz or meet with her in person.  Ms. Pugal replied

"Sorry Linh I can't" to one of the requests and ignored the others.  On October 24,

2022, Mr. Chong emailed Ms. Pugal (his third email to her), informing her that he

had left her a voice mail and asking if she had time to speak with him.  App. AAA.

Ms. Pugal again missed the weekly Wednesday call on October 26,

prompting the following email to her from Mr. Chaudhari, cc'ing Ms. Deitz, Mr.

Bodepudi, and Mr. Chong:

> Good morning Sally!  How are you?  We missed you on
> the Lamplight call this week.  Is everything ok?  Linh
> mentioned you are having some health issues.  So sorry
> to hear that!  We need to talk with you about that and
> how that might affect you not going.  You might be able
> to be excused for the Nov 4 hearing next week, but we
> need to talk with you about to figure that all out.

> Can you please text or call Linh and she can set up a time
> for you to talk with us?
>
> Thank you!  Have a nice day!! :)
>
> Papool

App. BBB at 2.  In a reply-to-all response to Mr. Chaudhari's email, Mr. Chong

stated: "I'm so sorry that you are not well. Is there anything that I can do for you?

We should really talk sooner than later."  App. BBB at 1.

On October 31, 2022, with still no word from Ms. Pugal, Mr. Chong

informed me in a letter that he "was first advised by Ms. Pugal's representative" on

October 21 that she had a health-related issue that might prevent her from

attending the November 4 hearing, that he had "attempted to contact Ms. Pugal

multiple times by email and telephone without success," and that he was not

certain Ms. Pugal would attend the November 4 hearing.  Civ. No. 22-0418, D.I.

20.

On November 2, 2022, Ms. Deitz again texted Ms. Pugal, and this time

raised the possibility of getting the hearing "dismissed":

> Hey Sally[.]  I heard you were sick.  I hope you feel
> better soon.  Is it possible to talk with Gau and Papool?
> They think if they draft a declaration for you to sign
> stating you are having medical issues, they can try to get
> the hearing dismissed.  But we need to get this done
> ASAP.  We're supposed to fly out tomorrow.

App. CCC at 1.  Ms. Pugal replied a few hours later:

> Hi Linh!  I know you probably hates me so much not
> being so-co-operative with y'all and I am so sorry[.]
> There's a lot going on right now that I am so stressed.  I
> have been sick since last week.

App. CCC at 2.  Ms. Pugal then described her serious health issues for Ms. Deitz

and concluded: "Anyway, I will be glad to talk to them hopefully they can get it

dismissed[.]  Again, my apology[,] Linh."  App. CCC.

Mr. Chaudhari then emailed Mr. Chong, cc'ing Mr. LaPray, Ms. Deitz,

Maher, Mr. Bodepudi, and Mr. Chong's paralegal (but not Ms. Pugal) as follows:

> Jimmy,
>
> As you know, Sally finally got back to Linh with the text
> that was sent to you.  I understand you want a doctor's
> note, but given that we just finally heard back from Sally
> after being ghosted for quite some time and the hearing
> being on Friday, it isn't likely or feasible that we'll have
> one by the hearing.  Hence, we are preparing a
> declaration that Linh will take to her tonight for her to
> sign.  We will also have Linh ask Sally to get a doctor's
> note asap that states that her doctor will not permit her to
> fly.
>
> Given the circumstances and timing for Friday, that's the
> best we can do.
>
> Papool

App. DDD.[25]

Later that evening, Ms. Deitz emailed Ms. Pugal a draft declaration and then brought a copy of it to Ms. Pugal's house for her to sign. The declaration discusses certain "health reasons" that rendered Ms. Pugal "unable to fly to Delaware" for the November 4, 2022 hearing. It appears from the document production that Mr. Chong played no role in drafting or discussing with Ms. Pugal the declaration. Ms. Deitz emailed Mr. Chong a copy of the declaration the morning of November 3, and he filed it with the Court that day. App. EEE.[26]

On November 30, 2022—one year to the day after Mr. Chong filed the first of six lawsuits he filed on behalf of Lamplight—Mr. Chong wrote in an email to Ms. Pugal:

> As you know I represent your business in its patent infringement cases. I have been communicating with it through Mavexar based on you retaining it to represent you. I wanted to reach out to you independently and

---

[25] The email is marked "Confidential Attorney-Client Privilege and/or Common Interest Attorney-Client Privilege." The email, however, does not disclose a communication to or from a client and therefore it is not an attorney-client communication, let alone a privileged attorney-client communication.

[26] App. EEE is marked "Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege." It consists of an electronic scan confirmation and a declaration of Ms. Pugal that was filed with the Court the day before the November 4, 2022 hearing. The emails do not disclose a communication to or from a client and therefore are not attorney-client communications, let alone privileged attorney-client communications.

> confirm that you want me to communicate with the
> Mavexar team directly.

App. FFF at 1.[27]  Having received no response from Ms. Pugal, Mr. Chong

followed up with another email on December 12, 2022:

> I am just following up on my last email.  I need to have
> in my file that you confirm that I should directly contact
> Mavexar when handling your cases or if I should contact
> you directly.  I obviously can contact the both of you.  It
> is up to you and I am happy to do either.  Please let me
> know.

App. FFF at 3.  A few hours later, Ms. Pugal responded that Mr. Chong "may

contact Mavexar directly."  App. FFF at 2.  By the time he received this response,

Mr. Chong had filed and settled six lawsuits in Lamplight's name.[28]

## V.

"It is well-settled law, regardless of jurisdiction, that attorneys owe their

clients a fiduciary duty."  *Huber v. Taylor*, 469 F.3d 67, 81 (3d Cir. 2006)

(citations omitted).  "The duty includes undivided loyalty, candor, and provision

---

[27] The emails in App. FFF are marked privileged, but because they merely
communicate the general terms of Mr. Chong's representation of Lamplight, they
are not privileged.  *Idenix Pharms.*, 195 F. Supp. 3d 639 at 643; *see also Avgoustis*,
639 F.3d at 1344.

[28] *See* notices of voluntary dismissal filed at Civ. No. 1:22-cv-418, D.I. 21 (Nov. 2,
2022); Civ. No. 1:21-cv-1689, D.I. 14 (Jun 3, 2022); Civ. No. 1:22-cv-1017, D.I.
10 (Sep. 13, 2022); Civ. No. 1:21-cv-1691, D.I. 13 (May 13, 2022); Civ.  No. 1:22-
cv-417, D.I. 7 (Apr. 14, 2022); Civ. No. 1:21-cv-1690, D.I. 9 (Mar. 2, 2022).

[to the client] of material information." *Id.* (citing *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)).  The Third Court's discussion about these duties in *Huber* is applicable here:

> The fiduciary duty that an attorney owes clients is not a matter to be taken lightly. . . .  As then Judge Cardozo observed in *In the Matter of Rouss*, "[m]embership in the bar is a privilege burdened with conditions." 221 N.Y. 81, 84, 116 N.E. 782 (1917) (Cardozo, J.).  Among those conditions are the ethical obligations of giving clients full and meaningful disclosure of conflicts of interest so that the client may decide if the representation is in his or her best interest and of the terms of proposed settlement agreements, as it is the client's, not the attorney's, decision whether to settle a case.  TEX. DISCIPLINARY R. PROF'L CONDUCT 1.03 (duty to keep client informed); 1.04(f) (fee division); 1.08(f) (disclosure of aggregate settlements).  Even when clients are viewed as mere "inventory", they are still owed the renowned "punctilio of an honor the most sensitive." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (N.Y. 1928) (Cardozo, J.).  As the Texas Disciplinary Rules of Professional Conduct state[,] the "obligation of lawyers is to maintain the highest standards of ethical conduct." TEX. DISCIPLINARY R. PROF'L CONDUCT, Preamble.
>
> This is the cost of doing business as an attorney at law, and we will not countenance shortcuts.  Disclosures to clients must be meaningful, by which we mean something beyond form disclosures, as clients must understand a conflict to give their informed consent to an intelligible waiver.

*Id.* at 82.

Many if not all the lawyer's fiduciary duties are codified in the American Bar Association's Model Rules of Professional Conduct. *See* MODEL RULES OF PRO. CONDUCT (AM. BAR. ASS'N, 1983) (hereinafter Model Rules). As lawyers practicing before this Court, Messrs. Pazuniak, Chong, Wernow, and Curfman are bound by the Model Rules. D. Del. LR 83.6(d).

Rule 1.2, titled "Scope of Representation & Allocation of Authority Between Client & Lawyer," provides in relevant part:

> [A] lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter.

Model Rule 1.2. This Rule codifies what has long been recognized as a fundamental guiding principle of the attorney-client relationship: The "decision[] . . . whether to settle a civil matter, must . . . be made by the client." Model Rule 1.2 cmt. 1. Indeed, the Supreme Court has recognized since at least 1901 "that the decision to settle a case rests with the client alone." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 986 F.2d 15, 19 (2d Cir. 1993) (citing *United States v. Beebe*, 180 U.S. 343, 350– 53 (1901)).

83

Rule 1.4, titled "Communications," provides in relevant part:

> (a) A lawyer shall:
>
> > (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;
> >
> > (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished; [and]
> >
> > (3) keep the client reasonably informed about the status of the matter . . . .
>
> (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Model Rule 1.4. Under Rule 1.4, "a lawyer who receives from opposing counsel an offer of settlement in a civil controversy . . . must promptly inform the client of its substance unless the client has previously indicated that the proposal will be acceptable or unacceptable or has authorized the lawyer to accept or to reject the offer." In addition, Rule 1.4 obligates a lawyer to "explain [to the client] the general strategy and prospects of success" in any litigation matter. Model Rule 1.4 cmt. 5.

Rule 1.7 codifies the lawyer's duty of loyalty. It provides in relevant part that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest" unless the "client gives informed consent [to the

84

representation], confirmed in writing." Model Rule 1.7.  Implicit in Rule 1.7 is an

obligation to "determine whether a conflict of interest exists."  Model Rule 1.7

cmt. 2.  And in making that determination, the lawyer must keep in mind that

"[e]ven where there is no direct adverseness, a conflict of interest exists if there is

a significant risk that [the] lawyer's ability to consider, recommend or carry out an

appropriate course of action for the client will be materially limited as a result of

the lawyer's other responsibilities or interests."  Model Rule 1.7 cmt. 8.

Under Rule 1.7, "[c]oncurrent conflicts of interest can arise from the

lawyer's responsibilities to another client, a former client *or a third person* or from

the lawyer's own interests."  Model Rule 1.7 cmt. 1 (emphasis added).  If a third

person is advancing or paying the lawyer's fees, Rule 1.8(f) applies.  It provides

that

> [a] lawyer shall not accept compensation for representing
> a client from one other than the client unless:
>
> (1)  the client gives informed consent; [and]
>
> (2)  there is no interference with the lawyer's
>      independence of professional judgment or with the
>      client-lawyer relationship . . . .

Model Rule 1.8(f).

It appears that counsel violated both Rule 1.2(a) and Rule 1.4 by failing to

have any communication with their clients before filing, settling, and dismissing

85

the clients' cases.  Mr. Pazuniak was sole counsel of record in the 11 cases filed in

this Court on behalf of Nimitz.  He filed those cases and then moved to dismiss

seven of them without ever having communicated with Mr. Hall, the sole natural

person associated with Nimitz.  It is undisputed that Mr. Hall had no prior

knowledge of the lawsuits and that he was neither informed of nor consented to the

settlements that resulted in the motions to dismiss the seven cases filed by Mr.

Pazuniak.

Mr. Chong was sole counsel of record in the six cases he filed in this Court

on behalf of Lamplight.  He filed and moved to dismiss all six cases without ever

having communicated with Ms. Pugal, the sole natural person associated with

Lamplight.  Mr. Chong was Mellaconic's counsel of record in its case against

RideCell.  Civ. No. 20-1323, D.I. 1 (Sep. 30, 2020).  He filed and moved to

dismiss that case without ever having communicated with Mr. Bui, the sole natural

person associated with Mellaconic.  Civ. No. 20-1323, D.I. 12 (Mar. 24, 2021).

Mr. Chong was co-counsel with Mr. Curfman in 12 cases filed in this Court on

Mellaconic's behalf.[29]  They filed and then moved to dismiss those cases without

---

[29] *Mellaconic IP LLC v. Frontpoint Sec. Sols., LLC*, Civ. No. 21-0447, D.I. 1 (filed
Mar. 26, 2021); *Mellaconic IP LLC v. Wyze Labs, Inc.*, Civ. No. 21-0448, D.I. 1
(filed Mar. 26, 2021); *Mellaconic IP LLC v. Central Sec. Group-Nationwide, Inc.*,
Civ. No. 21-0573, D.I. 1 (filed Apr. 26, 2021); *Mellaconic IP LLC v Monitronics*

ever having communicated with Mr. Bui.  Finally, Mr. Chong was co-counsel with

Mr. Wernow in six cases filed in this Court on Mellaconic's behalf.[30]  They filed

and moved to dismiss those cases without ever having communicated with Mr.

Bui.

It also appears that counsel violated Rule 1.7 and, to the extent their fees

were paid or advanced by Mavexar or IP Edge, Rule 1.8(f).[31]  As an initial matter,

by failing to communicate with their clients, counsel violated their obligation to

ascertain at the outset of their representations whether a conflict or potential

conflict existed.  Beyond that, the terms of Mavexar's consulting services

---

*Int'l, Inc.*, Civ. No. 21-0574, D.I. 1 (filed Apr. 26, 2021); *Mellaconic IP LLC v. Canary Connect, Inc.*, Civ. No. 21-0944, D.I. 1 (filed June 29, 2021); *Mellaconic IP LLC v. Fantasia Trading LLC*, Civ. No. 21-0945, D.I. 1 (filed June 29, 2021).
[30] *Mellaconic IP LLC v. Trane Techs. Co. LLC*, Civ. No. 21-1080, D.I. 1 (filed July 28, 2021); *Mellaconic IP LLC v. Linxup, LLC*, Civ. No. 21-1081, D.I. 1 (filed July 28, 2021); *Mellaconic IP LLC v. Ezlo Innovation Ltd.*, Civ. No. 21-1373, D.I. 1 (filed Sep. 28, 2021); *Mellaconic IP LLC v. Verkada, Inc.*, Civ. No. 21-1374, D.I. 1 (filed Sep. 28, 2021); *Mellaconic IP LLC v. Incognia US Inc.*, Civ. No. 21-1844, D.I. 1 (filed Dec. 29, 2021); *Mellaconic IP LLC v. Carrier Global Corp.*, Civ. No. 21-1853, D.I. 1 (filed Dec. 30, 2021); *Mellaconic IP LLC v. Connecteam, Inc.*, Civ. No. 22-242, D.I. 1 (filed Feb. 25, 2022); *Mellaconic IP LLC v. PrismHR, Inc.*, Civ. No. 22-243, D.I. 1 (filed Feb. 25, 2022); *Mellaconic IP LLC v. TimeClock Plus, LLC*, Civ. No. 22-244, D.I. 1 (filed Feb. 25, 2022); *Mellaconic IP LLC v. Avast Software, Inc.*, Civ. No. 22-540, D.I. 1  (filed Apr. 27, 2022); *Mellaconic IP LLC v. Deputy, Inc.*, Civ. No. 22-541, D.I. 1 (filed Apr. 27, 2022); *Mellaconic IP LLC v. Justworks, Inc.*, Civ. No. 22-542, D.I. 1 (filed Apr. 27, 2022).
[31] As noted above, Mr. Bui testified at the November 4, 2022 evidentiary hearing that Mavexar paid Mellaconic's attorney fees in the form of a loan.  Civ. No. 22-0244, D.I. 20 at 96:8–14.

agreements with counsel's clients created at least potential conflicts of interest between Mavexar and the clients. Because of those potential conflicts, counsel's blind adherence to Mavexar's directions to file and settle cases in the clients' names created a significant risk that counsel's actions materially limited their representations of their clients.

The financial relationship between Mavexar and Nimitz, for example, makes clear that their interests were not perfectly aligned in the seven cases Mr. Pazuniak filed and settled without ever having spoken or otherwise communicated with Mr. Hall. According to Mr. Hall, Mavexar gets 90% of the profits obtained from asserting the #328 patent in litigation and Nimitz gets the remaining 10%. Nimitz, however, effectively takes on 100% of the risk associated with any litigation. Indeed, although Mr. Hall said he "wouldn't be able to explain it well" when I asked him at the November 4, 2022 hearing how Nimitz paid for the #328 patent, his answer to the question was spot on: "There was an agreement between Mavexar and myself where I would assume liability." Civ. No. 21-1247, D.I. 26 at 69:17–18.

That liability has at least three forms. First, under 35 U.S.C. § 285, Nimitz can be required to pay the attorney fees of any defendant that prevails in an infringement case brought in Nimitz's name. Second, Nimitz can be required to

pay any sanctions imposed by a court pursuant to Federal Rule of Civil Procedure 11 or the court's inherent powers. Third, Nimitz is required under the Mavexar consulting services agreement to reimburse Mavexar for the "Costs and Expenses" (which are defined in the agreement to include attorney fees as well as costs and expenses) advanced by Mavexar to litigate the #328 patent:

> For all Costs and Expenses relating to the monetization of the [#328 patent], Consulting Company shall advance such Costs and Expenses as one or more loans to Client. Such loans are reimbursable from Gross Recovery. In the event any such loan is not paid back in full from Gross Recovery, Client shall be responsible for full payment of all such loans. If Client fails to make such payment within 30 days following the termination of the final litigation filed pursuant to this Agreement, Consulting Company shall have all available recourse pursuant to law to obtain recovery for such loans.

App. K at 3. *See also* App. X at 3; App. NN at 3.

The only risk Mavexar assumes when an attorney files at Mavexar's direction an infringement case in Nimitz's name is the potential that Nimitz will not comply with its contractual obligation to reimburse Mavexar for the fees and costs Mavexar advances to that attorney that exceed any gross recovery. In other words, Mavexar has virtually nothing to lose and everything to gain (i.e., 90% of everything) from asserting the #328 patent in infringement suits around the country. Nimitz, by contrast, receives a tiny fraction of the litigation gains but it

and potentially Mr. Hall personally[32] have lots to lose if the litigation results in an adverse decision, sanctions, or fees and costs that exceed the gross recovery.  In light of these vastly different profit and risk profiles, it cannot be said that Mavexar's and Nimitz's interests were the same when it came to deciding to file or to settle the lawsuits Mr. Pazuniak brought in this Court in Nimitz's name.

As with Nimitz, Mellaconic's and Lamplight's interests in filing and settling patent infringement suits are not coextensive with Mavexar's interests. Mellaconic's and Lamplight's consulting agreements with Mavexar are identical to Nimitz's agreement with Mavexar; and therefore, like Nimitz, Mellaconic and Lamplight assume all the risk when Mavexar has attorneys assert their respective patents in infringement litigation.  Mellaconic's financial arrangement with Mavexar differs slightly from Nimitz's.  As noted above, Mr. Bui testified that the LLCs Mavexar formed in his name are obligated to pay Mavexar 95% of the profits gained from licensing and litigating the LLCs' patents.  That Mellaconic's arrangement with Mavexar is even more lopsided than Nimitz's arrangement

---

[32] *See, e.g., D.O.C.C. Inc. v. Spintech Inc.,* 1994 WL 872025, at *20 (S.D.N.Y. Aug. 15, 1994) (holding corporate officer personally liable for attorney fees under § 285 where officer's active participation in tortious conduct resulted in a finding that infringement suit was filed and maintained in bad faith, the corporation had no paid employees, and the corporation's only address was the officer's residential apartment).

makes it even more likely that Mellaconic's interests conflict with Mavexar's interests with respect to the filing and settling of cases.

The profit split between Mavexar and Ms. Pugal's LLCs is unknown. As with the Mellaconic and Nimitz productions, there is no document in Lamplight's production that identifies the percentage of the Net Proceeds Lamplight is required to pay Mavexar. The limited record evidence suggests that Lamplight's percentage share of any licensing or litigation profits is minimal at best. When Ms. Pugal texted Ms. Deitz that "you know that I don't even make money on any of the compan[ies] including [Lamplight]," Ms. Deitz did not deny the assertion. On the contrary, she acknowledged in her response that "I know you don't have that kind of money [to pay a sanction][;] that is why I'm trying to explain the severity of [you're] not going [to court]." App. ZZ at 12–14.

As a general matter, "a lawyer cannot delegate his fiduciary duties to another in an effort to avoid its strictures or to avoid responsibility for the manner in which they are undertaken . . . ." *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 234 (2d Cir. 1977). "[I]n the case of duty of loyalty, its non-delegability is so patent as to be axiomatic." *Huber*, 469 F.3d at 81 n.18. In these cases, counsel either ignored or delegated to Mavexar (i.e., IP Edge) their fiduciary

91

duties.  Mavexar, for its part, expressly disclaimed in its consulting services

agreements with those clients that it owed the clients any fiduciary duties:

> The Consulting Company shall provide non-legal
> services . . . .
>
> Client understands that Consulting Company is not a law
> firm, accounting firm, tax advisory, or the like.  Client
> will seek appropriate third[-]party accounting, tax, legal
> or similar advisory services. . . .
>
> The parties understand that Consulting Company is not a
> fiduciary of Client, and will act as an independent
> contractor.

App. K at 1; App. X at 1; App. NN at 1.

Counsel insist that they do not represent IP Edge or Mavexar and that their

only client in each action they filed was the plaintiff LLC in that action.  Mr.

Pazuniak was most emphatic about this point in his October 18, 2022 email to Mr.

Hall.  He wrote there: "[A]s a legal and professional matter, my only client is

Nimitz Technologies, and, thus, you.  I do not represent Mavexar or any other

entity, and I would be in breach of professional responsibilities if I placed any

interest ahead of yours."  App. S at 2.  Unfortunately, this recognition of the

fiduciary responsibilities Mr. Pazuniak owed to Nimitz came six months after he

had already settled and moved to dismiss seven suits he had filed in Nimitz's

name.  And since Mr. Pazuniak had never communicated with Mr. Hall before he

filed, settled, and moved to dismiss Nimitz's cases at Mavexar's direction, how could he have been sure that his actions did not put Mavexar's interests ahead of Nimitz's?

Counsel seem to hold the view that a client can delegate to a third party all litigation decisions, including the decision to settle a case, and that an attorney can conduct all communications with a client through that third party.  In the reply brief he filed with the Federal Circuit in support of Nimitz's petition for mandamus, for example, Mr. Pazuniak wrote "[i]n excess of caution" that under section 134(2) of the Restatement 3d of the Law Governing Lawyers, "[Nimitz] had the right to authorize Mavexar to act as its consulting agent to act on [Nimitz's] behalf as if it was the client."  Section 134(2), however, provides in relevant part that

> [a] lawyer's professional conduct on behalf of a client
> may be directed by someone other than the client if:
> (a) the direction does not interfere with the lawyer's
> independence of professional judgment; (b) the direction
> is reasonable in scope and character, such as by reflecting
> obligations borne by the person directing the lawyer; *and*
> *(c) the client consents to the direction . . . .*

D.I. 26 at 17 n.1.  RESTATEMENT (THIRD) OF THE L. GOVERNING LAWYERS § 134(2) (AM. L. INST. 2000) (emphasis added).  Here, it is undisputed that Mr. Pazuniak filed and settled seven Nimitz cases without ever having communicated with Mr.

Hall, let alone having obtained Mr. Hall's informed consent to have Mavexar direct Mr. Pazuniak's professional conduct.

The "Third Parties," "Instructions," and "Communication" sections of Sand, Sebolt's engagement letter with Mellaconic quoted above, *supra* pp. 46–47, similarly suggest that Messrs. Wernow and Curfman take the position that they obtained Mr. Bui's consent to having Mavexar direct their conduct with respect to all matters in Mellaconic's cases when they received from Ms. Deitz an electronic signature for Mr. Bui dated March 11, 2021 under an "Acknowledgement" on the engagement letter's last page.  App. BB.  But even assuming that a client could delegate to a third party the authority to approve the lawyer's filing and settling of the client's lawsuit and assuming further that Mr. Bui received and read the letter and signed the acknowledgement himself, his signature could not constitute informed consent to having Mavexar make all decisions relating to litigation brought in Mellaconic's name.  Under the Model Rules, a client's informed consent to a proposed course of conduct can only be obtained "after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."  Model Rule 1.0(e).  Here, neither Mr. Wernow nor Mr. Curfman had ever spoken with Mr. Bui as of March 11, 2021, and nothing in the engagement letter apprised Mr.

94

Bui about potential conflicts of interests between Mellaconic and Mavexar or about the risks Mellaconic would face by asserting its patent in infringement litigation. The letter is exactly the type of form disclosure condemned by the Third Circuit in *Huber*. Mr. Bui's "acknowledgement" of the engagement letter's terms is, in a word, illusory.

Counsel's relationship with IP Edge and Mavexar and their failure to fulfill their fiduciary duties is especially concerning because of the obvious disparity in the sophistication of the LLC plaintiffs as opposed to Mavexar and IP Edge. That disparity was readily apparent from Mr. Bui's testimony at the November 4, 2022 hearing. It can also be seen in the text message exchanges between Ms. Pugal and Ms. Deitz. And it is evident from the lopsided terms of the consulting servicing agreements.

The terms of that agreement and counsel's actions in these cases deprived the LLC plaintiffs of the benefit of independent counsel. We can only guess whether the LLC plaintiffs would have agreed to file and settle these cases had they had counsel who cared only about the LLC plaintiffs and their interests. Perhaps, with the benefit of independent counsel, Mr. Bui would have agreed to file these suits but only if Mellaconic received more than a five percent share of the litigation proceeds. And if Mellaconic truly owned the #435 patent, perhaps, with

95

the benefit of independent counsel's advice, Mr. Bui could have sold the patent.[33]

These and related questions will remain unanswered because counsel here failed to

satisfy their "ethical obligations of giving [their] clients full and meaningful

disclosure of conflicts of interest so that the client[s] [could] decide if the

representation [wa]s in his or her best interest and of the terms of proposed

settlement agreements." *Huber*, 469 F.3d at 82.  I will therefore refer counsel to

their respective offices of disciplinary counsel.

## VI.

Mavexar's consulting agreement with the LLC plaintiffs in these cases

describes the "services" Mavexar provides as "non-legal" and expressly states that

Mavexar is "not a law firm."  The documents produced in response to the

November 10 Memorandum Order, however, make clear that numerous Mavexar

and IP Edge actors engaged in the practice of law on behalf of Nimitz, Mellaconic,

and Lamplight.  The documents show specifically that Messrs. Chaudhari,

---

[33] Under the Consulting Services agreement, Mellaconic "agree[d] to maintain
clear and exclusive title to the [#435 patent]."  App. X at 1.  But even though the
Termination section of the agreement has a paragraph that expressly addresses the
consequences that would follow "[i]n the event Client sells or transfers a portion or
all of the right, title, and interest in the [#435 patent] *for non-monetary
consideration*," App. X at 4 (emphasis added), the agreement says nothing about
the consequences that would follow if Mellaconic sold the #435 patent for
monetary consideration.

Bodepudi, and Tran each acted as a lawyer for one or more of the three LLC plaintiffs. The lawyer tasks they performed varied by individual and LLC and included providing patent infringement claim charts,[34] drafting and editing legal filings,[35] conducting legal research,[36] summarizing and analyzing legal research,[37] crafting legal arguments,[38] preparing a declaration for Ms. Pugal,[39] and prepping Mr. Bui and Mr. Hall for their testimony at the November 4, 2022 hearing.[40]

Mavexar and IP Edge are Texas entities. In Texas, an individual can be criminally prosecuted for the unauthorized practice of law. See Tex. Penal Code Ann. § 38.123. Texas law defines the "practice of law" in relevant part as

> the preparation of a pleading or other document incident to an action or special proceeding or the management of the action or proceeding on behalf of a client before a judge in court as well as a service rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge . . . .

Tex. Gov't Code Ann. § 81.101(a).

---

[34] App. GGG at 1–3.
[35] App. GGG at 4–11.
[36] App. GGG at 12–13.
[37] App. GGG at 12–13.
[38] App. GGG at 12–13.
[39] App. GGG at 14–15.
[40] App. GGG at 16–21.

Messrs. Chaudhari, Bodepudi, and Tran appear to be lawyers and residents of Texas.  In Texas, in "general[], a corporation can employ attorneys in-house to represent its own interests but cannot engage in the practice of law by providing legal representation to others with different interests." *Unauthorized Prac. of L. Comm. v. Am. Home Assur. Co.*, 261 S.W.3d 24, 26 (Tex. 2008).  In these cases, for the reasons discussed above, Nimitz, Mellaconic, and Lamplight had different interests than Mavexar (and IP Edge) did.

As it appears that Messrs. Chaudhari, Bodepudi, and Tran engaged in the unauthorized practice of law, I will refer them to the Texas Supreme Court's Unauthorized Practice of Law Committee.

## VII.

Section 261 of the Patent Act requires the PTO to "maintain a register of interests in patents and applications for patents and [to] record any document related thereto upon request." 35 U.S.C. § 261.  Although the recording of patent assignments with the PTO is not mandatory, federal law requires that any assignments submitted for recording with the PTO be true and accurate.  Indeed, in order to file an assignment for recording in the PTO's Electronic Patent Assignment System (EPAS), the filer (referred to in the EPAS as the "submitter") must first affirmatively consent (by clicking a button on the screen) to an

98

acknowledgement that "providing false or spurious information such as false or

improper assignment documents or security agreements[] is a misrepresentation to

the federal government" that "is prohibited and subject to criminal and civil

penalties, including all penalties applicable to willful unauthorized access" of the

EPAS.  App. B.

The acknowledgement cites, and thus points the EPAS user to, two specific

regulations promulgated by the PTO (37 C.F.R. §§ 1.4, 11.18) and to 18 U.S.C.

§ 1001.  Section 1.4 provides in relevant part that "[t]he presentation to the [PTO]

(whether by signing, filing, submitting, or later advocating) of any paper by a

party, whether a practitioner or non-practitioner, constitutes a certification under

§ 11.18(b)."  37 C.F.R. § 1.4.  Section 11.18(b)(1) provides in relevant part:

> By presenting to the [PTO] . . . (whether by signing,
> filing, submitting, or later advocating) any paper, the
> party presenting such paper, whether a practitioner or
> non-practitioner, is certifying that—
>
> (1) All statements made therein of the party's own
> knowledge are true, all statements made therein on
> information and belief are believed to be true, and all
> statements made therein are made with the knowledge
> that whoever, in any matter within the jurisdiction of the
> [PTO], knowingly and willfully falsifies, conceals, or
> covers up by any trick, scheme, or device a material fact,
> or knowingly and willfully makes any false, fictitious, or
> fraudulent statements or representations, or knowingly
> and willfully makes or uses any false writing or
> document knowing the same to contain any false,

> fictitious, or fraudulent statement or entry, shall be
> subject to the penalties set forth under 18 U.S.C. [§] 1001
> and any other applicable criminal statute . . . .

37 U.S.C. § 11.8(b)(1).  Section 1001 makes it a crime to knowingly submit to a

federal agency a "materially false, fictitious, or fraudulent statement or

representation."  18 U.S.C. § 1001(a).

I express no opinion about whether IP Edge's filing with the PTO of the

assignments for the patents asserted in these cases violated the PTO's rules or

§ 1001.  But I believe it appropriate to bring these matters to the attention of the

PTO and the Department of Justice to allow them to conduct further inquiry into

whether the PTO's rules or § 1001 were violated.  The Department may also deem

it appropriate to investigate whether the strategy employed by IP Edge to hide from

the defendants in these cases and the Court real parties in interest, including France

Brevets, violated any federal laws. [41]

---

[41] The French government dissolved France Brevets in October 2022—after Nimitz had settled 11 cases in this Court.  *See En capitalisant sur le retour d'expérience de plus de dix années de France Brevets, le gouvernement réorganise le pilotage et les actions de sa politique de soutien à la propriété industrielle au service de l'innovation [By capitalizing on the feedback from more than ten years of France Brevets, the government is reorganizing the management and actions of its policy of support for industrial property in the service of innovation]*, SECRÉTARIAT GÉNÉRAL POUR L'INVESTISSEMENT [GENERAL SECRETARIAT FOR INVESTMENT OF THE FRENCH REPUBLIC] (Oct. 21, 2022), https://www.gouvernement.fr/en-capitalisant-sur-le-retour-d-experience-de-plus-de-dix-annees-de-france-brevets-le-

VIII.

The reality in these cases is that the de facto owner of the asserted patents—

that is, the party that truly controls and profits from their assertion—is IP Edge.

Brandon LaPray said the truth when he told Mr. Pazuniak in his August 17, 2021

email that "we"—i.e., IP Edge—"bought the patents."  IP Edge, however, has gone

to great lengths to hide the "we" from the world.  Rather than having the asserted

patents assigned to itself or to its own LLCs, IP Edge arranged for the patents to be

assigned to LLCs it formed under the names of relatively unsophisticated

individuals recruited by Linh Deitz.  The LLCs were empty vessels with no assets

until IP Edge arranged for the assignment of the patents to those LLCs.

The housing of assets in a separate LLC has consequences.  LLCs cannot act

in a court without legal counsel.  For the LLC plaintiffs to file infringement cases,

they had to have counsel.  And because IP Edge and Mavexar do not wholly own

the LLC plaintiffs and because IP Edge and Mavexar are not law firms, Texas law

prohibits them from acting as the LLC plaintiffs' lawyers.  Messrs. Chaudhari,

Pant, Bodepudi, and Tran chose to use separate LLCs to insulate themselves, IP

---

gouvernement [https://perma.cc/WYV8-8JT4].  Nothing in Nimitz's production
shows that France Brevets ever relinquished or transferred its interest in the
settlement proceeds from Nimitz's assertion of the #328 patent.

Edge, and/or Mavexar from the potential liabilities of patent litigation. They must accept the consequences that flow from that strategy.

Counsel of record for the LLC plaintiffs in these cases must also accept the consequences for the roles they played in implementing that strategy. The reality is that counsel's de facto clients were IP Edge and Mavexar. Counsel insist otherwise; indeed, they are adamant that their clients are the LLC plaintiffs. That being the case, counsel were obligated to give to the LLC plaintiffs their undivided loyalty and to provide the LLC plaintiffs with sufficient information and unconflicted advice for the LLC plaintiffs to make informed decisions about whether to bring and settle any proposed lawsuits. Instead of fulfilling those obligations, counsel treated the LLC plaintiffs as "mere inventory." *Huber*, 469 F.3d at 82. Their loyalty was not to their clients, but rather to IP Edge.